**NORTE & COMPANY, Plaintiff,**

v.

**R. L. HUFFINES, Jr., Victor Muscat, L. F. Serrick, Alfred O'Gara, Edward Krock and Defiance Industries, Inc., Defendants.**

No. 62 Civ. 3390.

United States District Court
S. D. New York.

June 27, 1968.

See also D.C., 222 F.Supp. 90.

Milton Paulson, New York City, for plaintiff.

Royall, Koegel, Rogers & Wells, New York City, for defendant R. L. Huffines, Jr.

Goldstein, Judd & Gurfein, New York City, for defendant Victor Muscat.

Hugh P. Mullen, New York City, for defendant Defiance Industries, Inc.

MANSFIELD, District Judge.

Following non-jury trial of this consolidated derivative stockholders' action in which Defiance Industries, Inc. ("Defiance" herein) was awarded damages in the sum of $3,199,297, plus interest, defendants Muscat and Huffines move for a new trial pursuant to Rules 52, 59 and 60, F.R.Civ.P., or, alternatively, for rehearing on the issue of damages on the ground of newly discovered evidence and that the damages awarded are excessive.

The damages awarded in favor of Defiance against the individual defendants Muscat and Huffines, directors of Defiance, resulted from two transactions that were authorized and participated in by them at Defiance's expense:

(1) *"The 1962 Exchange,"* i. e., the issuance by Defiance of 487,502

shares of its Class B Voting Stock in exchange for all the outstanding stock of Insurance and Industrial Enterprises, Inc. ("IIE" herein), 77% owned by Muscat, Huffines and their co-venturer, Edward Krock, pursuant to defendants' recommendation valuing the IIE stock at $70.51 per share; and

(2) *"The September 6, 1961 Transaction,"* i. e., acquisition of 10,507 shares of IIE stock (representing approximately 10% of its issued stock) by the triumvirate of Muscat, Huffines and Krock at a price of $20.94 per share, which they then caused Defiance to acquire as part of the aforementioned 1962 Exchange at a value of $70.51 per share, realizing a profit of approximately $520,832.

Damages in the sum of $2,993,000 were awarded in favor of Defiance against defendants Muscat and Huffines on the ground that approval of the 1962 Exchange by Defiance stockholders was secured by defendants through false and misleading proxy material in violation of §§ 10(b) and 14 of the Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78j(b) and 78n, and SEC Rule 10b–5 issued thereunder, and also on the ground that it was a self-dealing transaction grossly unfair to Defiance in that is was required to pay an excess of $29.93 per share for approximately 100,000 shares of IIE. With respect to the September 6, 1961 Transaction, damages in the sum of $206,357 were awarded on the ground that defendants deprived Defiance of a corporate opportunity to purchase the IIE shares at the lower price and reaped a profit at the expense of Defiance.

Defendants' post-trial motions raise no substantial question with respect to the September 6, 1961 Transaction or their liability for any damages caused by the 1962 Exchange. With respect to the question of damages awarded on account of the 1962 Exchange, defendants do not now attack the valuation of IIE stock received by Defiance in the exchange,[1] an issue fully litigated at trial, where it was determined to be worth $40.58 per share rather than the $70.51 per share adopted by defendants, an excess of $29.93 per share for approximately 100,000 shares of IIE, or $2,993,000.

The gist of defendants' present contentions is that the loss suffered by Defiance on the exchange was less than $2,993,000, and may even be eliminated completely, because the stock issued by Defiance in payment for the IIE shares was worth less than the $14.49 per share found by the Court so that, at the exchange ratio of 4⅞ Defiance shares per one IIE share, Defiance did not pay as much as $70.51 per IIE share.

The issue of damages was before the Court at trial and was fully litigated, and defendants do not suggest that there is any pertinent newly discovered evidence. Accordingly defendants' motion to reopen the case for the introduction of additional evidence is denied. Defendants rely primarily on material already in the record, such as market data in the pretrial order, and also raise questions of law in urging that the damages awarded are excessive.

Review of that record reveals that defendants' present contention to the effect that Defiance stock was over-valued is not only belated, but contrary to, and inconsistent with, the proof offered by the parties and the position taken by the defendants both at pretrial and trial. Until the Court's decision the $14.49 price was accepted by them as a fair and reasonable figure resulting from an appraisal (Ex. 13 in evidence) made by well-recognized independent experts retained by the defendants themselves to

1. Defendants suggest in passing that the valuation of IIE stock was erroneous because it was based on the price received in the subsequent sale of its principal subsidiary, National Bankers Life Insurance Co. ("Nablico" herein), and this price was abnormally depressed by the "market break" of May 1962. However, the "market break" cannot be considered to have distorted the valuation of Nablico or IIE because the market fully recovered by December 1962, two months before the sale of Nablico in February 1963.

evaluate Defiance's stock for the purpose of determining how many shares would be required to acquire IIE, which was valued at $7,050,759. At no point prior to the present post-decision motions did defendants question the value of $14.49 per Defiance share. Instead, defendants took the position that the study and report made at defendants' request by Hayden Stone & Co., a well known firm of highly regarded experts specializing in independent appraisal of corporate holdings, which evaluated Defiance as having a fair value of $14.49 per share, was entitled to great weight in determining the relative values and ratios to be assigned to the stocks of the companies involved. Referring to the retention of Hayden Stone, Muscat testified:

"Q  Who, on behalf of the company, that is, Defiance, negotiated with whom on behalf of the stockholders of I. and I. E.?

A  The way the whole transaction was set up was that we wanted strictly impartial people to make the report, and to set it up, so the only discussion, actually, was after the Hayden Stone report.

Q  As you said before, the exchange ratio was made on the basis of the Hayden Stone report?

A  Right." (Muscat Dep. pp. 43–44)

"Q  *  *  *  Do you know of any reason why Hayden Stone didn't use the figures I have just read to you from Exhibit 2 for identification at Pages 4 and 5?

A  Mr. Paulson, I am sure you know that we picked the best accountants, the best legal people, and the best investment houses to make these full studies. And each one may have their own interpretation. But I can assure you that they are the ones that put these figures together. I have not gone into the details at all, because if I could do it, I wouldn't need Peat Marwick, or Hayden Stone or anybody else.

So whatever they put down, I am sure is the way the S. E. C. wanted that report. I am sure on this report Hayden Stone was presenting the good sides, the bad sides. They may have their own interpretation.

All I can do is go to the best people in the country and ask them to help us out." (Muscat Dep. pp. 61–62)

In its opinion the Court found that the value of $14.49 per Defiance share recommended by Hayden Stone was sound, but concluded that Hayden Stone had erred in its evaluation of IIE for the reason that it had been misled by certain inflated earnings figures furnished to it by the defendants for IIE's principal subsidiary, Nablico, all of which is more fully detailed in the Court's earlier opinion.

The methods used by Hayden Stone in the study leading to this report are well recognized and have been repeatedly accepted by the courts. The report states (P. Ex. 13, p. 1) that the appraisals of Defiance and IIE "attempt to take into account all relevant factors, including asset values, earning power, and past performances as well as future potentials. Due to the substantially different natures of the companies concerned, the approach for each is by necessity different in certain aspects." [2]

2. The approach was thus similar to that described by the court in Diston v. Loucks, 62 N.Y.S.2d 138, 144 (Sup.Ct. N.Y.Co.1941), affd., 264 App.Div. 758, 35 N.Y.S.2d 715, leave to appeal to Court of Appeals denied, 264 App.Div. 838, 35 N.Y.S.2d 763 (1st Dept. 1942):
"Many factors must be considered in determining true value, and earning power and ability to pay dividends are not the least of those factors. Thus there must be considered the record of the corporation and its prospects for the future, the investment value as determined by the rate of return, the selling price of stocks of like character, the appraised and sale value of assets, the market conditions, and any other relevant evidentiary facts and circumstances relating to the property which may reflect themselves in the worth of the stock." (62 N.Y.S.2d at 144).

After careful review of all of the principal factors affecting the value of Defiance's stock, Hayden Stone, stating that its appraisal was for the purpose of determining the value of Defiance shares that might be issued in connection with a proposed merger, concluded that "the common equity of the Serrick Corporation [Defiance] is appraised at a fair value of * * * $14.49 per Class B share" (P. Ex. 13, p. 22). Thus, in order to acquire assets found to be worth between $6,751,686 and $7,350,338 Defiance would be required to issue almost 500,000 shares of Class B common stock.

■ Accepting this evaluation of Defiance stock by independent experts as fair and reasonable, the defendants used it as the basis for their recommendation to Defiance stockholders "that the proposed ratio of exchange is a fair one" (Proxy Statement, P. Ex. 1, p. 10), and relied upon it throughout the trial. Now for the first time they seek to impeach the evaluation, arguing that Hayden Stone improperly considered book value, liquidation value and replacement value. This argument is without merit. Valuation of Defiance by the capitalization of earnings approach was inappropriate because of significant recent losses. Furthermore, although Hayden Stone took into account the current market value of Defiance shares, which had been recently traded on the American Stock Exchange at $13 per share, it refused to accept such market price as equivalent to "fair value," and properly so because of the light trading in the stock; for example, of 220,000 shares outstanding, only 2,600 shares were traded in June, 1961. Market price is significant only

> "where there is a free and open market and the volume of transactions and conditions make the market a fair reflection of the judgment of the buying and selling public." Application of Marcus, 273 App.Div. 725, 727, 79 N.Y.S.2d 76, 78 (1st Dept. 1948), app. dism., 277 App.Div. 963, 99 N.Y.

S.2d 849 (1st Dept. 1950), affd., 303 N.Y. 711, 103 N.E.2d 338 (1951).

The thinness of the market in Defiance stock was recognized by the defendants as rendering current market prices inappropriate for evaluation purposes. The defendant Huffines testified " * * * it was a very thin market, very little trading," (Huffines Dep. p. 35), and Muscat testified that although the stock of Defiance was listed on the American Stock Exchange, in June of 1962 it "had a very, very thin market" (Muscat Dep. p. 70).

Giving consideration to market value, but recognizing its weakness as the sole measure of the value of Defiance, Hayden Stone stated:

> "The principal approach in appraising [Defiance] is from the point of view of asset values, namely the relationship between the book value of the company and the replacement and liquidating values of its capital assets. These values are compared with the market value of the company's stock. Because of the downward trend of earnings in recent years and the substantial deficits reported for fiscal 1960 and the nine month interim period to March 31, 1961, no meaningful appraisal may be obtained on the basis of earnings or average earnings over a 5 or 10 year period." (P. Ex. 13, p. 5)

Turning then to asset value, the principal alternative to the capitalization of earnings approach, Hayden Stone concluded that the stated book value of $14.49 per share in this instance also represented fair value. In arriving at this conclusion, Hayden Stone took into account that the stated book value tended to understate fair value because of liberal depreciation reserves. The well-depreciated figure at which assets were carried on the books was illustrated by reference to the sale of certain machinery at Defiance's Muncie, Indiana plant which resulted in a profit of $172,000 over a book value of $65,496. Hayden Stone also considered replacement value, but did not place much reliance on it, not calculating a firm total figure for replacement value.

Observing that "In arriving at what is considered a fair value for [Defiance] it is necessary to balance the various factors discussed above" (i. e., book value, replacement cost, recent market price, and possible future plans of management), Hayden Stone concluded:

"Taking into consideration the past record of the company, the steps new management is taking to restore operations to a profitable basis, and the generally liberal depreciation reserves, we believe the stated book value * * represents a fair value for the corporation * * *. We do not feel the company can at present be valued fairly at a higher figure because of the lack of demonstrated earning power of the capital assets. To value [Defiance] at a lower figure would be equally inequitable in view of the well-depreciated figure at which the assets of the company are carried on its books."

Defendants' attack on the Hayden Stone report as erroneously relying on book value is, therefore, without foundation. The report considered the liberal depreciation reserves and, weighing the results of this asset valuation approach along with the earnings record, particularly the recent losses, concluded that fair value was $14.49 per share. Throughout the trial defendants accepted as authoritative the Hayden Stone report, including its valuation of the stock to be issued by Defiance at $14.49 per share and although they were given ample opportunity to challenge it or to offer any evidence tending to show a lower value for the Defiance stock, they chose not to do so. The report therefore constitutes probative and convincing evidence, particularly since it represents the results of an independent appraisal by recognized experts in the evaluation of corporate properties, who were eminently well qualified. Repeatedly the defendants pointed to the fairness of the report,

Muscat going so far as to testify that the effect of the report was to render the Defiance transaction an arm's-length one.[3]

Accordingly the Court found that the fair value of the 487,502 shares of Defiance Class B Voting Stock issued in exchange for the outstanding stock of IIE was $14.49 per share, and that finding is adhered to now.

Defendants next argue for the first time that even if Hayden Stone correctly valued Defiance stock at $14.49 per share, its report was issued in June 1961 and conditions had changed by the time the exchange was consummated a year later. More specifically they point to the fact that while the market price of Defiance stock in June 1961 was about $13 per share, the price on June 20, 1962 (when the stockholder meeting approving the exchange was held) had declined to about $8 per share. However, while market price is properly considered as one of the factors in arriving at a value for Defiance stock, it is neither controlling nor conclusive. Hayden Stone found the Defiance stock to be worth $14.49 per share although its recent market price had been $13 per share. The lack of significant trading in Defiance stock in June 1962, volume being only 2,800 shares for the month (see Appendix A), undercuts the significance to be attached to the market data for that month.

Neither Hayden Stone nor the defendants (at least until this Court rendered its decision) believed that changes in stock market conditions occurring in June 1962 required a re-evaluation of the Defiance shares to be issued for IIE's stock. On this subject Huffines testified:

"Q The covering letter submitting this Hayden Stone report was dated June 30, 1961; is that correct?

A Yes.

Q You mean it was arm's-length because Hayden Stone was involved?
A That's exactly what I mean." (Muscat Dep. p. 68).

---

3. "Q The transaction where Defiance acquired the 100 per cent of the stock of I. and I. E. was an arm's-length transaction?
A Uh huh.

Q   And the acquisition was not voted on by the stockholders until June of 1962, about a year later.

Do you know whether or not in that interim of a year, the Hayden Stone report was brought up to date?

A   Well, I know that they had information on the companies, in that interim period.

Q   Did they submit any further report?

A   I do not think so.

My belief is they did not find it necessary or advisable to change anything in the report; but they did have operating figures on the company in the period." [4] (Huffines Dep. p. 57)

Furthermore, defendants place undue emphasis on the market price of about $8 per share for June 20, 1962. That market price cannot be considered out of the context of market data over the period of time surrounding that date. The market prices for Defiance stock from January to July 1962, as listed in the pretrial order, are as follows:

1962

| Jan. | 9  | 11⅜  | April | 11 | 12¼  |
|------|----|------|-------|----|------|
|      | 19 | 11¾  |       | 13 | 12¾  |
|      | 23 | 11½  |       | 19 | 11½  |
|      | 30 | 11½  |       | 27 | 12   |
| Feb. | 2  | 11¼  | May   | 1  | 11¾  |
|      | 9  | 12⅜  |       | 28 | 11   |
|      | 16 | 13   | June  | 7  | 9⅝   |
|      | 23 | 13½  |       | 15 | 7¾   |
| Mar. | 2  | 13½  |       | 22 | 8    |
|      | 9  | 13½  | July  | 6  | 8    |
|      | 19 | 13½  |       | 12 | 9    |
|      | 27 | 12¾  |       | 20 | 8¼   |
|      |    |      |       | 27 | 7    |

Thereafter, the market price rose slightly to a high of 8½ in early September 1962 and then declined further.

■   This data reveals that from January until May 28, 1962 the market price

of Defiance stock remained in the vicinity of the $13 per share, the same price taken into account by Hayden Stone in valuing the stock at $14.49 per share. That the market price thereafter dropped was, as defendants admit, in part the result of extraordinary market conditions, namely, the "market break" of May 1962, from which general market prices did not recover until about December 1962. As market price is a reliable indicator of value only where "conditions make the market a fair reflection of the judgment of the buying and selling public," Application of Marcus, supra, the sharp drop in the market price of Defiance stock for the month of June as a result of abnormal market conditions cannot be considered significant in valuing Defiance.

Furthermore, the depressed price of the Defiance stock in June 1962 may also have been in part the result of the public announcement in the proxy statement of May 28, 1962 of the forthcoming exchange with IIE at a grossly excessive price. Defendants argue that the finding by the Court that the proxy statement was misleading would tend to "puff" the value of the Defiance stock rather than depress it. However a few sophisticated professional traders (as distinguished from the average investor) would recognize that the ratio of exchange with IIE was grossly unfair to Defiance; and a market as thin as that prevailing at the time would be made by just such sophisticated professionals. Defendants can hardly take advantage of a fall in market price caused by their own breach of fiduciary obligation in recommending a ratio so detrimental to Defiance by arguing that that drop in price is to be taken into account in mitigation of the damages to Defiance.

Discounting the probative value of the market performance of Defiance stock for the period following May 28, 1962 because of the distortions introduced by the public announcement of the exchange and also the temporary "market break"

---

4.   These figures indicate an improvement in Defiance's earnings to the point of a   profit of approximately $150,000 for the last six months of 1961 (P. Ex. 1, p. 13).

which occurred about that time, it appears that from about January to May 1962 the market price of Defiance stock was in the vicinity of, but averaged slightly below, the $13 per share which Hayden Stone took into account in valuing the stock at $14.49 per share as of June 1961. However, against this slight decrease in market price must be weighed the increase in Defiance's earnings after June 1961, which improved to the point of a profit of approximately $150,000 for the last six months of 1961 (P. Ex. 1, p. 13).

Furthermore, prior to this Court's decision the defendants themselves did not consider the market price of Defiance's stock on June 20, 1962 to reflect its fair and true value. It is significant, for instance, that in the pretrial order the defendants, rather than select the June 20, 1962 market price as the indicator of market value to be used in describing the exchange, chose the bid and asked prices of Defiance stock on the American Stock Exchange on May 8, 1962, resulting in a value of $11.625 per share (Stip. of Facts No. 19, Pretrial Order filed June 13, 1966). In addition the defendants repeatedly testified that the market price of Defiance stock did not reflect its true or fair value, not only because of the thinness of trading in the stock but also for the reason that a premium of at least 25% must be added for control. Although defendants, as the owners of approximately 33⅓% of Defiance's issued stock before acquisition of IIE's stock, had working control of Defiance, the proposal under consideration was the issuance of 487,502 shares of Defiance stock which, being more than 50% of its issued stock, would constitute actual control of Defiance, supplanting their prior working control. In describing the additional shares to be issued, Muscat stated in an affidavit filed June 26, 1964:

"23. The stock in Serrick owned by the interested directors at the time of the transaction was 'control' stock. Consequently, the additional shares received[5] were also 'control' stock, the market value of which cannot be measured by the price on the American Stock· Exchange. 'Control' stock has, by definition, no market. There are strict limits on its marketability. Thus, its market value cannot be measured by reference to the American Stock Exchange price quotations."

Both Huffines and Muscat testified that a premium of 25% over market price for control stock was low in the case of industrials such as Defiance (Muscat Dep. p. 66; Huffines Dep. p. 73). But even the addition of only a 25% premium to the $11.625 per share market price stipulated by defendants as the basis for valuing the 487,502 Defiance shares would result in a value of $14.53 per Defiance share as compared with $14.49 found by Hayden Stone to be a fair figure.[6]

■ On balance, the Court therefore concludes that its valuation of Defiance stock at $14.49 per share at the time of the exchange was not rendered excessive as a result of the market break following May 28, 1962, but represented a conservative estimate of its fair value.

■ Defendants further contend that the valuation of Defiance stock at $14.49 per share may not be used as a basis for assessing the damages suffered by it in paying an excessive price for the IIE stock because the valuation of Defiance stock is based on book value and the valuation of IIE is based principally on the market value of its principal subsidiary, Nablico. Defendants argue that a comparison using two such different standards, like a comparison of "apples" and "pears," is impermissible, and urge that the valuation of Defiance be made on a "comparable" basis by using the market price of its stock. However, the compelling reasons for the inappropriateness

5. Referring to the 487,502 shares issued in exchange for IIE.

6. It is well-recognized that a controlling block of stock has greater sale value than a small lot. See Perlman v. Feldmann, 219 F.2d 173, 50 A.L.R.2d 1134 (2d Cir.), cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955).

of the market price of Defiance stock as a yardstick have already been noted. Apparently recognizing these reasons, defendants argue in the alternative that the market price of about $11 per share at which Defiance stock was selling in early May, before the "market break" and public announcement of the exchange, be used as a basis for determining the amount of the excess which Defiance paid for the IIE shares.[7] The fact remains, however, that trading in the stock was so relatively light that market price cannot be considered the sole indicator of fair value.[8]

Furthermore, defendants' "apples and pears" argument is unjustified, at least under the circumstances of this case. The valuation of IIE primarily on the basis of the selling price received for its principal subsidiary, Nablico, in an arm's-length transaction, does not lead to the conclusion that the market price of Defiance stock should be the sole measure of value in any comparison with IIE. Neither the price paid for stock of IIE nor the market price of the stock of Nablico were the exclusive, or even the primary, basis for the valuation of IIE; and neither the Court nor Hayden Stone limited themselves to comparing the "liquidation" value of Defiance with the "market" value of IIE, as defendants charge. No one measure of value, such as book value, liquidation value, or replacement value, was exclusively used. The respective values of the stock of Defiance and IIE each were calculated on the basis of a variety of factors, which included earning power, adjusted book value, liquidation value, replacement value, and the selling price of stocks. The result of this process of valuation was the determination of fair value for Defiance stock of $14.49 per share and a fair value for IIE stock of $40.58 per share. Thus it was not error, in comparing the fair value of the stocks being exchanged to find that 4⅞ shares of Defiance stock worth $70.51 were issued in exchange for one share of IIE stock worth $40.58 per share, an excess of $29.93 per IIE share, and a total excess of $2,993,000 for 100,000 IIE shares.

■ Defendants further contend that the damages are excessive for the reason that the award of approximately $3 million is roughly equal to the net worth of Defiance as of 1962, and argue that "It is hard to conceive how a corporation valued at slightly over $3 million could have lost $3 million and still remain intact." However, the evaluation of Defiance as worth $14.49 per share for purposes of acquiring IIE leads to the conclusion that Defiance had the capacity to acquire additional assets worth more than $7 million for almost 500,000 additional shares to be issued by it, which would thereby increase its net worth to over $10 million. Instead of acquiring assets worth the value of the additional shares, Defiance received assets worth only $4,057,759, or $2,993,000 less than the value of the shares. Defendants' suggestion that Defiance suffered no damage as a result of the issuance of almost 500,000 additional shares in exchange for over-valued consideration is without merit. See Hooper v. Mountain States Securities Corp., 282 F.2d 195, 203 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed. 2d 693 (1960); Simon v. New Haven Board and Carton Co., 250 F.Supp. 297 (D.Conn.1966).

■ As an alternative to their argument that the excessive price paid by Defiance was less than the $2,993,000 awarded because the stock issued by Defiance was worth less than the $14.49 per share found by the Court, defendants argue that the damages to Defiance should be calculated on a theory other

---

7. As already noted, addition of a 25% premium for control value would increase the $11 price to approximately the $14.-49 value adopted by the Court.

8. From May 1 to 27, 1962, the only trading was 100 shares on May 1, so that the market prices to which defendants refer are merely bid and asked prices. See Appendix A.

than the loss suffered by Defiance in the exchange. First, they suggest that the amount of profit made by defendants on the exchange is the appropriate measure of recovery due to Defiance. Although recovery of profits may be awarded where one who breaches a fiduciary obligation makes profits in excess of the loss caused by the breach, see Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418 (1921), one who breaches a fiduciary obligation is responsible for the entire loss suffered by the corporation as a result of the breach. This liability is not limited to the recovery of profits or to "out-of-pocket" loss, i. e., the value of the stock which Defiance issued as a result of defendants' fraud less the value of IIE stock received, but is measured under the "loss of the bargain" rule by the difference between the value of what Defiance would have received if defendants' false and misleading representations based on an evaluation of the IIE stock as worth $70.51 per share were true,[9] and the value of what it actually did receive. See McCormack on Damages § 121 (1935 ed.); Gray v. Gordon, 96 Ohio St. 490, 117 N.E. 891 (1917); Henschel v. Schreiber, 72 N.E.2d 107 (Ohio Ct.App. 1946).

Second, defendants suggest that damages should be awarded not to Defiance but to the individual stockholders of Defiance, other than Huffines, Muscat, Krock and their associates, who held their Defiance stock immediately prior to the 1962 Exchange. Defendants argue that only these stockholders suffered actual damage by dilution of the value of their holdings. However, this is a derivative action brought on behalf of Defiance in which recovery was awarded to Defiance for damages suffered by it as a result of its paying an excessive price for IIE and being deprived of the opportunity to purchase IIE at $20.94 per share. The general rule in a derivative action is that recovery is awarded to the corporation on behalf of which suit is brought, and that the corporation may not be "by-passed" by an award to individual stockholders on a pro rata basis, which would, in effect, declare a dividend of the corporate recovery. See Liken v. Shaffer, 64 F. Supp. 432 (N.D.Iowa 1946, per Graven, J.); Keenan v. Eshleman, 23 Del.Ch. 234, 2 A.2d 904, 912–913, 120 A.L.R. 227 (1938); 13 Fletcher Cyclopedia of Corporations (1961) 641–47 § 6028.

This case does not fall within the exceptions to this rule which have occasionally been made to avoid unnecessary litigation, such as when a corporation is in process of liquidation, see Bowker v. Nashua Textile Co., 103 N.H. 242, 169 A.2d 630 (1961), and in other unusual circumstances, see Perlman v. Feldmann, 219 F.2d 173, 50 A.L.R.2d 1134 (2d Cir.), cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955) (pro rata recovery awarded to remedy the sale of corporate control for excessive consideration); May v. Midwest Ref. Co., 121 F.2d 431 (1st Cir.), cert. denied, 314 U.S. 668, 62 S.Ct. 129, 86 L.Ed. 534 (1941) (dismissal of a derivative suit sustained upon the offer by defendant, who owned 99.96% of the stocks, to pay the plaintiff-shareholder the maximum amount that his share interest could have been depreciated by any wrongful dealings); Di Tomasso v. Loverro, 250 App.Div. 206, 293 N.Y.S. 912 (2d Dept.), affd., 276 N.Y. 551, 12 N.E.2d 570 (1937) (pro rata recovery awarded to plaintiff who brought a derivative action on behalf of a closely held corporation against defendants, who included all the other stockholders but one). Furthermore, that certain of the present stockholders of Defiance may not have been stockholders at the time of the transactions complained of is no ground for diminishing the damages awarded to the corporation. Overfield

---

9. The same misinformation which led Hayden Stone to recommend the $70.51 figure could reasonably be expected to lead a Defiance stockholder to the same result.

v. Pennroad Corp., 48 F.Supp. 1008, 1018 (E.D.Pa.1943), revd. in part on other grounds, 146 F.2d 889 (3d Cir. 1944); cf. Central Ry. Signal Co. v. Longden, 194 F.2d 310 (7th Cir. 1952). They are not unjustly enriched by the award to the corporation because at the time of purchase they acquired a proportionate indivisible interest in the claims asserted in this action on its behalf, see Pollitz v. Gould, 202 N.Y. 11, 15, 94 N.E. 1088, 38 L.R.A.,N.S., 988 (1911). Finally, there is no suggestion that a pro rata award is required because a corporate recovery would be dissipated by the management, see Backus v. Finkelstein, 23 F.2d 357 (D.Minn.1927). Accordingly, since none of the special circumstances in which pro rata recovery has been awarded exist here, the theory of the derivative action must be recognized and recovery awarded to the corporation.

■ Finally, defendant Huffines urges that the award of prejudgment interest should be vacated on the grounds that the award is not required to compensate Defiance for loss of money or its equivalent and that Huffines did not realize substantial profits by his wrongdoing. The award of interest on unliquidated claims is a matter within the discretion of the Court both with respect to the federal claims under §§ 10 and 14 of the Securities and Exchange Act of 1934, see Ross v. Licht, 263 F. Supp. 395 (S.D.N.Y.1967), and with respect to the claims under state law for breach of fiduciary obligation, see Hey v. Cummer, 89 Ohio App. 104, 97 N.E. 2d 702 (1950) (interest awarded on secret profits gained by agent at his principal's expense).

Huffines argues that the award of interest in this case is improper on the grounds (1) that Huffines did not in fact realize a profit on the Defiance shares issued to him, since in 1966 82,809 shares were sold at $8 per share and 16,500 shares at prices ranging from $10.80 per share to $12.55 per share; and (2) that there is no showing that Defiance would have realized an economic benefit from the excess shares issued as a result of the over-valuation of IIE.

■ The basic principle governing the exercise of the Court's discretion in deciding whether to award prejudgment interest is the fundamental consideration of fairness rather than measurement of the value of the use to which property or money might have been put by the plaintiff if it had not been deprived thereof by the defendants' wrongful conduct.

"[I]nterest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness." Board of Comm'rs of Jackson County v. United States, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939).

■ With respect to the September 6, 1961 Transaction the defendants wrongfully deprived Defiance of the opportunity to buy shares at $20.94 per share instead of the much higher price paid through issuance of Defiance stock, thereby realizing a profit of $206,357 after adjustment for damages awarded against them with respect to the 1962 Exchange. The loss to Defiance was clear and immediate, and the defendants' wrong was flagrant. In view of the contemporaneous September, 1961 resolution of Defiance's Board recommending the acquisition of the IIE shares, and the fact that the shares were soon thereafter acquired by Defiance from the defendants at the higher price, there can be little question about the fact that if the opportunity to buy the shares had been offered to it at $20.94 per share, Defiance would have taken advantage of that opportunity. Under such circumstances, imposition of prejudgment interest on the profit of $206,357 is fully justified.

With respect to the 1962 Exchange, the fact that Huffines did not in fact realize a profit on this sale of Defiance shares acquired by him is not persuasive. 82,809 of these shares were sold in 1966 to a nominee for a group consisting of Muscat and Messrs. Roy Cohn, Thomas

A. Bolan and William P. Ruffa. In 1966 the present action on Defiance's behalf was pending, so that if Huffines had chosen to retain his Defiance shares, an award of damages in Defiance's favor would have resulted in an increase in the proportionate share of the corporation's equity attributable to the Defiance stock owned by him. The fact that Huffines decided to sell most of his shares instead of awaiting the outcome of this suit was his business and his risk. As it is, he apparently sought to protect himself by obtaining an indemnity from Muscat, the value of which must be added to the 1966 sales price. Furthermore, if hindsight, including post-1963 events, is to be used—and it is extremely questionable whether it should be—defendants cannot select certain facts and ignore others. Records of trading on the American Stock Exchange, see Appendix B, reveal that in 1966 Defiance Class B common stock reached a high of $17⅞ per share in March, $17½ per share in April, $14⅜ per share in May, $15 per share in June, $15½ per share in July, and $13¾ per share in August; and that the volume of trading, unlike the total of 6,500 shares during April-June, 1962, inclusive, see Appendix A, was as follows: March, 324,000 shares; April, 244,100 shares; May, 83,900 shares; June, 93,-100 shares; July, 75,700 shares; and August, 51,500 shares. If allowance were made for two stock dividends declared between June 1962 and 1966, which total 17%, the price of a Defiance Class B common share acquired in June 1962 would have gone even higher.

The defendants' suggestion that prejudgment interest should not be awarded in the absence of a showing that Defiance would have realized an economic benefit from the excess shares issued pursuant to the over-valuation of IIE must be dismissed as meritless. See Board of Comm'rs of Jackson County v. United States, supra. The effect of the suggestion would be to ignore their egregious malfeasance in using false and misleading statements having the effect of over-valuing IIE, 77% of which was owned by them, for the purpose of obtaining excess shares. This is not a case of innocent wrongdoing or even of negligence on the defendants' part. It is a case of abuse of fiduciary duty carried out by the defendants with a view to profiting at the expense of those to whom the duty was owed and through use of materially false and misleading statements. As a direct result of their misconduct, Defiance issued more than 200,000 shares (worth $14.49 per share) over and above what it would have issued if the truth with respect to the value of IIE shares had been disclosed. There is no evidence supporting Huffines' suggestion that Defiance could not obtain property or money worth $2,993,000 in exchange for these excess shares, other than defendants' contention that current stock market prices of Defiance stock were substantially lower than $14.49 per share. The unreliability of such prices, in view of the extreme thinness of the market in Defiance stock and the fact that such lower prices may well have been attributable in part to defendants' own unconscionable conduct, does not entitle them to be relieved of prejudgment interest. Furthermore, Defiance's capacity to realize this amount is illustrated not only by the later increase in the market price of its stock (up to $17⅞ per share in 1966), but by its issuance of additional shares in recent years in exchange for acquisition of other properties. The fact remains that Defiance suffered $2,993,000 in damages as a result of the defendants' flagrant breach of trust.

Accordingly defendants' motions are denied in their entirety. Pursuant to Rule 52(b), F.R.Civ.P., the foregoing shall constitute additional findings of fact and conclusions supplementing those found in the Court's decision dated May 15, 1968. Judgment will be entered in favor of Defiance, with the plaintiff being authorized to take all steps necessary to issue execution on its behalf.

Settle order.

APPENDIX A

DEFIANCE INDUSTRIES, INC.

DAILY VOLUME OF TRADING ON THE AMERICAN STOCK EXCHANGE
April 1, 1962 – June 30, 1962

| Trading Date | | Day of Week | Volume Sales in 100's | No Trading Only Bid & Asked Prices Shown | Monthly Total |
|---|---|---|---|---|---|
| April | 2 | M | | X | |
| | 3 | T | 200 | | |
| | 4 | W | | X | |
| | 5 | T | | X | |
| | 6 | F | | X | |
| | 9 | M | | X | |
| | 10 | T | | X | |
| | 11 | W | 300 | | |
| | 12 | T | | X | |
| | 13 | F | 800 | | |
| | 16 | M | 100 | | |
| | 17 | T | 200 | | |
| | 18 | W | | X | |
| | 19 | T | 400 | | |
| | 20 | F | Market Closed | – | Religious Holiday |
| | 23 | M | | X | |
| | 24 | T | | X | |
| | 25 | W | 500 | | |
| | 26 | T | | X | |
| | 27 | F | 100 | | |
| | 30 | M | | X | 2,600 |
| May | 1 | T | 100 | | |
| | 2 | W | | X | |
| | 3 | T | | X | |
| | 4 | F | | X | |
| | 7 | M | | X | |
| | 8 | T | | X | |
| | 9 | W | | X | |
| | 10 | T | | X | |
| | 11 | F | | X | |

868

| Trading Date | | Day of Week | Volume Sales in 100's | No Trading Only Bid & Asked Prices Shown | Monthly Total |
|---|---|---|---|---|---|
| May | 14 | M | | X | |
| | 15 | T | | X | |
| | 16 | W | | X | |
| | 17 | T | | X | |
| | 18 | F | | X | |
| | 21 | M | | X | |
| | 22 | T | | X | |
| | 23 | W | | X | |
| | 24 | T | | X | |
| | 25 | F | | X | |
| | 28 | M | 100 | | |
| | 29 | T | 800 | | |
| | 30 | W | Market Closed | – Holiday | |
| | 31 | T | 100 | | 1,100 |
| June | 1 | F | | X | |
| | 4 | M | | X | |
| | 5 | T | | X | |
| | 6 | W | | X | |
| | 7 | T | 100 | | |
| | 8 | F | | X | |
| | 11 | M | 100 | | |
| | 12 | T | | X | |
| | 13 | W | 200 | | |
| | 14 | T | 100 | | |
| | 15 | F | 1,200 | | |
| | 18 | M | 300 | | |
| | 19 | T | | X | |
| | 20 | W | 100 | | |
| | 21 | T | 100 | | |
| | 22 | F | 600 | | |
| | 25 | M | | X | (Name changed to Defiance) |
| | 26 | T | | X | |
| | 27 | W | | X | |
| | 28 | T | | X | |
| | 29 | F | | X | 2,800 |

(Source:  Wall Street Journal)

APPENDIX B

MONTHLY PRICES AND VOLUME OF DEFIANCE INDUSTRIES,
INC. CLASS B COMMON STOCK TRADED ON AMERICAN
STOCK EXCHANGE IN 1966

| 1966 | Volume (Shares) | High | Low | Close |
|------|-----------------|------|-----|-------|
| January | 29,800 | 6-7/8 | 5-3/4 | 6-3/8 |
| February | 48,800 | 8-1/2 | 6 | 7-3/4 |
| March | 324,100 | 17-7/8 | 6-5/8 | 14-3/8 |
| April | 244,100 | 17-1/2 | 10-1/4 | 13-3/4 |
| May | 83,900 | 14-3/8 | 10-1/4 | 12-3/8 |
| June | 93,100 | 15 | 11 | 14 |
| July | 75,700 | 15-1/2 | 11-3/4 | 12 |
| August | 51,500 | 13-3/4 | 9-3/4 | 10-1/4 |
| September | 30,000 | 11-5/8 | 9-3/8 | 10-3/8 |
| October | 53,000 | 13 | 8-1/8 | 12 |
| November | 27,100 | 11-7/8 | 8-7/8 | 9-1/4 |
| December | 67,100 | 11-7/8 | 9 | 9-5/8 |

SHARES OF DEFIANCE INDUSTRIES, INC. CLASS B
COMMON STOCK OUTSTANDING JUNE 30, 1962 TO
AUGUST 31, 1966

| Date | No. of Shares |
|------|---------------|
| 6/30/62 | 676,159* |
| 6/30/63 | 844,133 |
| 8/31/64 | 842,927 |
| 8/31/65 | 843,081 |
| 8/31/66 | 892,894 |

* Includes 487,502 shares of Class B stock
issued for outstanding stock of IIE on
July 13, 1962.