Jeff SIMON, as Custodian for Gail Nina Simon, Under the New York Uniform Gifts to Minors Act

v.

The NEW HAVEN BOARD AND CAR-TON COMPANY, INC., et al.

Civ. No. 10,425.

United States District Court,
D. Connecticut.

Jan. 8, 1974.

Bobroff, Olonoff & Scharf, New York City, for plaintiff.

William J. Doyle, Louis M. Winer, New Haven, Conn., for defendants.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

While some litigation under Rule 10b–5 [1] is "the unhappy aftermath of a corporate marriage gone sour," Republic Technology Fund, Inc. v. The Lionel Corporation, 483 F.2d 540 (2d Cir. 1973), this suit arises because the marriage was so successful that a member of the groom's family thinks there should have been a larger dowry. This is a stockholder's derivative action brought by the custodian of a minor who owns stock of The New Haven Board and Carton Company (hereafter "New Haven" or "the company"). Defendants are the company and several of the officers and directors. The amended complaint pleads two causes of action: count I, based on diversity jurisdiction, alleges that the three director-defendants who are residents of Connecticut breached their fiduciary duties imposed by the law of Connecticut; count II, for which jurisdiction is supplied by 15 U.S.C. § 78aa, alleges that all defendants violated Rule 10b–5.

The allegations arise in connection with a merger of several Florida corporations (hereafter "the Miami companies") into New Haven. Defendants Leon Simkins, Morton Simkins, and other members of their families owned all or most of the shares of the Miami companies. Prior to the merger the Simkins had acquired 32.6% of the outstanding shares of New Haven and had acquired and exercised the right to name a majority of New Haven's directors. Leon Simkins was serving as president of New Haven. The Simkins were in effective control of the company. The merger was accomplished by New Haven's issuance of 1,377,774 shares of its common stock to the shareholders of the Miami companies in exchange for all of the outstanding shares of common and preferred stock of the Miami companies.

1. Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5.

The agreement to merge was approved by the directors of New Haven on January 16, 1964, subject to stockholder approval. Proxies were solicited from New Haven shareholders by a proxy statement dated February 12, 1964, which was mailed on February 14, 1964, together with New Haven's annual report for the fiscal year ending September 30, 1963. The shareholders' meeting that approved the merger was held February 28, 1964. The original complaint was filed in April, 1964. A motion to dismiss was denied by Judge Zampano in 1966. Simon v. New Haven Board & Carton Co., Inc., 250 F.Supp. 297 (D. Conn.1966). For reasons not entirely clear, the case languished for several years. In 1972 it was assigned to me for trial, and a bench trial occurred on seven days in March, 1972. Because the parties wished to have a complete transcript before submitting briefs, it was not until February 28, 1973, that final briefs and supplementary correspondence from the parties were received. This Court is responsible for the delay since then, having accorded the case a priority roughly reflecting the urgency with which the parties readied the litigation for submission.

It is unnecessary to recount all the details of the bleak financial picture of New Haven prior to the merger. For five successive years beginning with 1959, the company had experienced heavy losses on sales that, since 1960, were only slightly declining.[2] Since 1959, retained earnings had dropped steadily from just over $2 million to just over $1/4 million in 1963. The market price of the company's stock, traded over-the-counter, reflected the company's deteriorating financial fortunes. The bid price ranged from 6½ to 12½ in 1959, from 2⅛ to 6⅛ in 1962, and from 2⅞ to 5 in 1963. With the exception of certain block purchases to be discussed, the market for New Haven shares was thin, with only nominal trading.

Confident that their managerial capability, demonstrated in their successful operation of the Miami companies, could make New Haven profitable, the Simkins acquired control of the company in 1963, after it had experienced a succession of management changes, and in 1964 decided upon the merger. The merger terms were set by dividing the then current bid price for New Haven shares, $4.50, into the value of the Miami shares, which had been determined by an independent appraisal to be $6,200,000. This computation produced 1,377,774 as the number of New Haven shares to be issued in exchange for the Miami shares.

Plaintiff's 10b–5 claims are based on alleged misrepresentations and omissions in the proxy statement and the accompanying 1963 annual report, that were mailed to shareholders of New Haven on February 14, 1964.[3] A princi-

2. The figures derived from the company's annual reports are as follows:

|  | 1959 | 1960 | 1961 |
|---|---|---|---|
| net sales | $18,588,063 | $24,634,543 | $21,596,039 |
| net income (loss) before special items | ($648,880) | ($934,793) | ($366,982) |

|  | 1962 | 1963 |
|---|---|---|
| net sales | $21,331,590 | $20,819,048 |
| net income (loss) before special items | ($81,032) | ($582,865) |

3. Plaintiff abandoned its claim that the proxy solicitation violated § 14 of the 1934 Act, because the solicitation was not subject to § 14 in February, 1964. Since New Haven's securities were traded over-the-counter, it was not subject to SEC proxy solicitation

pal but not the only challenged item is the omission of the results of an unaudited internal financial report for the company's first quarter, ending December 31, 1963, of its 1964 fiscal year. This report, prior to correction, showed first-quarter profits of $148,590. Plaintiff's essential contention, in support of which its expert, Dr. Douglas Bellemore, testified at length, is that disclosure of this first-quarter report would have provided a basis on which shareholders could have concluded that the value of New Haven shares at the time of the merger was not $4.50 per share, but $8.62½ per share. Using this higher price per share, plaintiff claims that New Haven was damaged in two ways: (a) by "paying" too much for the Miami shares; the overpayment is claimed to be the alleged price per share of $8.62½ times the number of shares issued, 1,377,774, or $11,883,301, less the value of the shares received in exchange, $6,200,000, a difference of $5,683,301, and (b) by losing the opportunity to sell, at the highest price since the merger, the "extra" shares issued to the Simkins; since a price per share of $8.62½ divided into the $6,200,000 value of the Miami companies would have required issuance of only 718,841 shares, plaintiff subtracts this figure from the 1,377,774 shares actually issued to arrive at 658,933 "extra" New Haven shares issued to the Simkins, which, at a post-merger high price of $21.50 per share, might have been sold to the public at a total price of $8,483,762.[4] Plaintiff seeks a money judgment of $14,167,063 in damages plus an accounting of the profits made by the individual defendants.

At trial plaintiff made clear that it was abandoning earlier claims for re-scission and was limiting its requested relief solely to a claim for damages and an accounting. From the above computations, it is apparent that the linchpin of the claim for damages is the alleged price of New Haven shares of $8.62½, or any price above the merger price of $4.50. Moreover, analysis of plaintiff's causes of action will demonstrate that plaintiff is entitled to no judgment unless the company has been damaged by issuance of its shares at the $4.50 price.

Both the 10b–5 claim and the claim arising under state law are brought as derivative actions on behalf of the corporation. Any claim for relief to shareholders of the company on a class action theory was specifically disclaimed by plaintiff at trial and, in any event, would fail in the absence of any evidence that plaintiff could establish the requisite jurisdictional amount in controversy. There is no doubt that a derivative action can be brought for violation of Rule 10b–5, Ruckle v. Roto American Corporation, 339 F.2d 24 (2d Cir. 1964), and that a corporation's issuance of its shares is a "sale" within the meaning of the Rule. Ibid.; see also Hooper v. Mountain States Securities Corp., 282 F.2d 195 (5th Cir. 1960). On the motion to dismiss, defendants alleged that the complaint failed to allege facts constituting damage to the issuing corporation, on the theory that even if the shares had been undervalued with consequent issuance of excess shares, the only damage was dilution of the value of the interest held by each shareholder. Judge Zampano rejected this argument, relying on Ruckle and Hooper for the proposition that a corporation, shown to have issued its shares for less than their fair value, has been damaged. That rul-

---

rules until the 1964 amendments to the 1934 Act, adopted August 20, 1964, took effect. 15 U.S.C. §§ 78*l*(g) (1) (A), 78m, 78n.

4. In view of the factual findings, *infra*, concerning the premise of plaintiff's claims for damages, it is unnecessary to decide whether, were any damages incurred, plaintiff would be entitled to collect not only the difference between value of assets received and value of shares issued, but also the expected income from subsequent sale of the "excess" shares issued. *See* Smith v. Bolles, 132 U.S. 125, 10 S.Ct. 39, 33 L.Ed. 279 (1899); Levine v. Seilon, Inc., 439 F.2d 328 (2d Cir. 1971); Zeller v. Bogue Electric Mfg. Corp., 346 F.Supp. 651 (S.D.N.Y.1972).

ing on the motion to dismiss is the law of this case. Under the ruling, issuance of shares for less than fair value could produce damages in two ways: (a) loss to the company measured by the difference between the value of the shares issued and the value of the assets received in exchange, and (b) injury to the corporate integrity of the company measured by the damage attributable to any lessened ability to attract public capital investment or to obtain institutional financing as a result of the excess issuance of its shares.

■ From the evidence in this case, it is apparent that the issuance of 1,377,774 shares valued at $4.50 per share caused no damage whatever to the corporate integrity of New Haven. There was no evidence to show any diminution in the company's capacity, as a result of the merger ratio, to attract capital or loans. On the contrary, the merger vastly improved the company's financial structure and operating capability. Thus, the only theory of damages available to the plaintiff, on the 10b–5 count, is that the merger resulted in receipt of inadequate consideration or, to put it another way, issuance of an excessive number of shares. Since plaintiff disclaimed any attack upon the valuation, by independent appraisal, of the value of the Miami companies received in exchange for the New Haven's shares, and there was no evidence that the Miami companies were overvalued, the claim of inadequate consideration rests entirely on the contention that the issued New Haven shares were worth in excess of $4.50 per share.

Plaintiff's state law claim also turns ultimately on the appropriateness of the $4.50 per share valuation. While not developing the state law claim with much precision, plaintiff apparently alleges both a breach of common law fiduciary duties by the three Connecticut directors, *cf.* Richland v. Crandall, 262 F. Supp. 538 (S.D.N.Y.1967), as well as a violation of the provisions of the State's corporation law, Conn.Gen.Stat. § 33–323. This statute renders voidable a contract between a corporation and another company in which a director of the corporation has an interest unless the interest is fully disclosed and the "transaction is fair as to the corporation." If the conditions are not met, the corporation may rescind or receive damages. § 33–323(c). Since plaintiff has abandoned any claim for rescission, his only state law claim is for damages. And, as with his 10b–5 claim, the only respect in which the merger is alleged to have damaged the corporation is the issuance of its shares for less than adequate consideration.

■■ The state law claim may, however, affect the burden of proof. The proponents of a transaction covered by § 33–323 have the burden of proving that the transaction is fair and for adequate consideration. Osborne v. Locke Steel Chain Co., 153 Conn. 527, 534, 218 A.2d 526 (1966). Since the price of the New Haven shares is the only factor, from the evidence in this case, that could entitle the corporation to damages by reason of a transaction that was not "fair," the defendants may have the burden of proving the fairness of this price.[5] In any event, all of plaintiff's claims for damages turn on the appropriateness of the $4.50 price. Since the evidence establishes that the fair market value of New Haven's shares at the time of the merger was not more than $4.50 per

---

5. Even if defendants have the burden of proving that $4.50 per share was adequate consideration in order to discharge their burden of showing that the transaction was fair, it may be that plaintiff cannot recover any damages for the corporation unless he can satisfy the burden of proof usually assumed by plaintiffs to prove actual damage, *i. e.*, proof that the shares actually were worth some price in excess of $4.50 per share. Theoretically, at least, were the evidence evenly balanced (which it is not), defendants would have failed to show that the transaction was not voidable, but plaintiff, suing only for damages, would have failed to establish that the corporation is entitled to recover any specific amount of money.

share, even if defendants have the burden of proof on this issue of fact, it will be necessary to consider in detail only the evidence on this issue, without reaching the issues of whether or not a material misrepresentation or omission occurred.

Plaintiff's principal evidence to establish a value of New Haven shares in excess of $4.50 per share was a price-earnings analysis presented by Dr. Bellemore, based on the unaudited, internal financial report for the first quarter of fiscal 1964, covering the three months ending December 31, 1963. The Bellemore analysis, in the circumstances of this case, does not establish a value in excess of $4.50 per share for the shares issued to the Simkins for several reasons. Some of the reasons to be discussed are sufficient to reject his analysis in and of themselves. In combination, their effect plainly undermines his conclusion.

■ 1. The premise of the Bellemore analysis is the application of a price-earnings ratio to a projection of a full year's earnings estimated from the earnings of a single quarter. Relying on Norte & Co. v. Huffines, 288 F.Supp. 855 (S.D.N.Y.1968), defendants contend that, as a matter of law, valuation based on a price-earnings ratio is unreliable when the earnings in the equation have been preceded by a "significant recent series of substantial losses." Id. at 859. New Haven's alleged first quarter earnings of $148,590 had been preceded by five years of losses totaling more than $2½ million. Even if use of a price-earnings ratio is not barred as a matter of law, the inappropriateness of its use as a factual matter in this case is at least as great as in Norte & Co. This conclusion is underscored by the factors that remain to be considered.

2. Even if a price-earnings ratio can be applied to earnings preceded by substantial losses, such analysis lacks solidity when the earnings are a projection of a full year from a single quarter rather than actual results of a twelve-month pe-

riod. Dr. Bellemore recognized the added uncertainty of a projection, since he annualized the first-quarter earnings by a factor of three instead of four. That caution does make the total analysis a bit more conservative, but it does not eliminate the basic guess as to whether the earnings would continue at all. Of course, all price-earnings analysis is premised on a guess as to future earnings, but a guess that future years will continue a trend set in a completed year is far more reliable than a guess that a full year will reflect the trend of a single quarter.

The hazards of projecting a full year of income from a single quarter are, especially evident in this case, since a full year's projection from the first *four* months is substantially *less* than a projection from the first *three* months. Earnings for the first three months, per the unaudited internal reports, were $148,590, but for the first four months, they were only $88,870. Had Dr. Bellemore annualized from the first four months, even if those months were fully annualized by a factor of three, the resulting price per share would have been less than the $4.50 paid by the Simkins. This is not to suggest that the results for the first four months are a more reliable basis for projection than for the first three months. But it does indicate the instability of analysis based on earnings projected from a fraction of a year.

Another hazard of the projection is the inevitable effect of hindsight. Dr. Bellemore conceded that the key judgmental question in his analysis was whether the first-quarter profit in fiscal '64 represented a "turn-around" or only an exception to a trend of losses. The question assumes special importance in this case since the first "quarter" of profit was in fact a first month of profit followed by two months of losses. Dr. Bellemore was persuaded that a turn-around had occurred because of his confidence in the new management and the fact that they had achieved a quarter of profit after being in control for only a

brief period. One cannot help but wonder whether the same conclusion would have been expressed as of the end of the first quarter if the ensuing quarters had showed continued losses, instead of the profits that in fact occurred after the merger. Would an experienced financial analyst testify to a price valuation that subsequent events demonstrated was too high? How much probative force can be given a projection that is confidently put forth in the knowledge that subsequent events in fact bore it out? [6]

The risk of hindsight affecting the legitimacy of the projection is evidenced by two aspects of the testimony in this case. First, though Dr. Bellemore insisted his analysis was made on the basis of "a continuing company without the merger," (Tr. 359), he permitted the prospect of a merger to strengthen his view concerning the company's capacity to generate earnings. For example, when cross-examined as to the company's capacity to replace old equipment when its cash reserves were rapidly declining, he replied: "I had faith in this management; they knew what they were doing, and if they needed equipment they would get it. They say how financially strong they are going to make it as a result of the merger, so *they* didn't worry about it." (Tr. 343, emphasis original). Secondly, in coming to the critical conclusion that the first-

quarter earnings represented a "turnaround" for the company, Dr. Bellemore acknowledged that he "went. carefully through" (Tr. 114) the deposition of William Medinger, New Haven's comptroller, a deposition given long after the merger. Apparently, it was Dr. Bellemore's position that the deposition alerted him to events that had occurred prior to the merger. However, when the question arose as to what his opinion would be in the absence of the later deposition, plaintiff's counsel offered to present later in the trial additional testimony from Dr. Bellemore that would isolate those portions of the Medinger deposition that referred to events before the merger. (Tr. 120, 130).[7] No satisfactory clarification of this point was ever supplied.

3. Even if a price-earnings analysis can be based on a year's earnings projected from earnings for one quarter, there was no adequate basis here for concluding that the first quarter was sufficiently representative to support the projection. In the preceding year, the first-quarter result was a loss of $376,519 compared to a full-year result of a loss of $559,889. More significantly, in fiscal '62, the first-quarter result was a profit of $55,467 compared to a full-year result of a loss of $81,032. Thus, regardless of Dr. Bellemore's confidence in the new management, first-

---

6. Plaintiff emphasizes the fact that New Haven's fiscal 1964 earnings turned out to be $445,700, a figure plaintiff, with unconcealed enthusiasm, compares with Dr. Bellemore's projection of full year earnings of $445,000. While conceding that full year earnings, known only after the merger, are not admissible to establish price per share at the time of the merger (plaintiff's brief after trial, p. 98), plaintiff does rely on the full year figure as "the most significant check of the reasonableness of Dr. Bellemore's valuation" (plaintiff's reply brief after trial, p. 83). Apart from the fact that this near perfect coincidence equally supports an inference of after-the-fact rationalization, rather than before-the-fact projection, the important issue is not whether Dr. Bellemore made a good guess, but whether, upon the facts properly knowable at the

time of the merger, a willing buyer would have parted with more than $4.50 to purchase a share of New Haven's stock. Those responsible for corporate decisions are not guarantors of the future. They do not insure against corporate losses, nor are they automatically liable to disgorge post-merger profits. Of course, Dr. Bellemore's testimony is *relevant* to the issue of price per share in January, 1964, but if his analysis is insufficient to support a *finding* of price in excess of $4.50, the defendants are not liable for damages simply because plaintiff's expert testified that he would have been able to predict the company's full year earnings.

7. The transcript at line 7 of page 130 refers to the "manager's" statement, but the context indicates that counsel was referring to the "Medinger" statements.

quarter profit figures were not shown to be sufficiently indicative of a full year's operation. They might support a prediction that the year would show a profit, but not a prediction of the amount of that profit, which became a critical factor in Dr. Bellemore's determination of price per share.

The substantiality of the first-quarter earnings as a base for a full year's projection was also undermined by the wild fluctuation in the monthly figures for that quarter. The first month showed a profit of $165,758, while the next two months showed losses of $70,858 and $5,659.

Dr. Bellemore contended that the representativeness of the first-quarter figures was evidenced by the sales figures. (Tr. 219). He claimed the company's November and December sales dropped only "in line with the industry." (Tr. 271). Yet the evidence shows that in the first quarter of fiscal '64, monthly sales figures were $2,428,973, $1,707,910, and $1,678,628. The November sales were 30% less than the October sales, a far more precipitous decline than the 5% that was recorded by the industry as a whole. (Pl.Ex. 66). Interestingly, the company's monthly sales figures for the first three months of the preceding fiscal year showed a modest decline of only 7% from October to November, followed by a slight increase in December.

4. Even if first-quarter earnings could be used as the basis for a price-earnings analysis, the evidence revealed that the unaudited figure of $148,590 was incorrect, and that the incorrectness was apparent from information available prior to the merger.[8] The company's figures for the four months ending January, 1964, showed a net profit of $88,870. The January figures alone showed a net loss of $8,451. When this January loss is subtracted from the four months' profit figure, the result is a first-quarter profit figure of $97,321 instead of $148,590. Irving Sklar, whose accounting firm supervised the preparation of New Haven's financial statements, testified that errors were corrected only in the year-to-date figures, without revising the prior monthly reports. (Tr. 704–08).

Sklar testified that in December an error was noted in the inventory figures which showed that income for the first quarter had been overstated by $55,832. Sklar used a corrected first-quarter earnings figure, broke out non-recurring items, and calculated a first-quarter earnings figure of $69,006. (Deft.Exs. E, F, and G). Applying Dr. Bellemore's analysis to this first-quarter figure, Sklar computed a price per share of $3.-37½.

Another infirmity in the $148,590 figure is the fact that it reflects no salary for either Leon or Morton Simkins. Dr. Bellemore testified he thought it was "a reasonable possibility" that they would take no salary during all of fiscal '64. (Tr. 294). However reasonable that possibility was, some salary should have been estimated in projecting a full year's profit before the profit figure could be used as a firm base for a price-earnings analysis to determine price per share.

8. Plaintiff disputes the propriety of relying on any information that became available after January 16, 1964, the date New Haven's directors approved the merger ratio. The evidence known prior to that date sufficiently establishes that the fair market value for New Haven stock was not in excess of $4.50. However, since the defendants are being sued for alleged derelictions in soliciting shareholder approval for a merger at a ratio based on the $4.50 price, there seems to be no reason why facts known at the time the proxies were solicited and the shareholder approval obtained are not relevant to a determination of the fairness of the merger price. Even if, for the sake of argument, the first-quarter report ought to have raised doubts in the minds of the directors that the ratio set in January, 1964, was appropriate, the information available to them prior to the proxy solicitation ought to have persuaded them to forego any possible doubts about the appropriateness of the ratio. The gravamen of their liability is not the setting of an unfair ratio but the obtaining of shareholder approval based on an unfair ratio.

5. While not as significant as the factors already mentioned, there was some weakness in Dr. Bellemore's selection of 7.5 as the proper multiple to be used for the price-earnings ratio. He calculated 15 as the average ratio for a group of companies listed in Standard & Poor's as being in the same product category as New Haven. These companies were considerably larger than New Haven and, their price-earnings ratio was computed on pre-tax earnings, whereas New Haven had a tax loss credit available to eliminate taxes in 1964. Dr. Bellemore discounted this ratio of 15 by 50% to allow for various uncertainties.

He also selected three medium-sized companies in the industry and found that their average price-earnings ratio was 13.6. Since he testified that smaller companies tend to have a smaller price-earnings ratio (Tr. 365), and since the sales of the three medium-sized companies ($44, $130, and $66 million) were still considerably larger than New Haven's ($21 million for fiscal '63) (Tr. 99), one might have thought that Dr. Bellemore would have selected a ratio less than 13.6 before applying his 50% discount factor. In fact, his analysis proceeded quite differently. In considering the 13.6 ratio of the medium-sized companies, Dr. Bellemore discounted this figure by 55% and arrived at the 7.5 figure that he had previously determined was appropriate. (Tr. 385–88). The selection of an appropriate ratio would have been more persuasive if a fixed discount factor had been applied to price-earnings ratios of companies with sales comparable to New Haven's.

I do not doubt that Dr. Bellemore was warranted in predicting from the advent of the Simkins' management and a first-quarter profit (of whatever figure) that New Haven might see better days ahead. His testimony would certainly support a conclusion that at $4.50 a share, New Haven might be an advantageous, if risky, purchase, though even that conclusion was not reached at the time by anyone else except the Simkins.

But his testimony is not persuasive that the fair market value of New Haven shares at the date of the merger was in excess of the $4.50 per share merger price.

Plaintiff's only other evidence to show a price per share in excess of $4.50 were the figures concerning the acquisition of 149,371 shares of New Haven's stock by the Simkins in July, 1963. They purchased a major block of 112,321 shares at $4.45 per share, plus a commission that brought the average price of the block to $4.56 per share. In addition, they bought an additional 37,050 shares at an average price of $4.88 per share. The average price for all of these shares was $4.64 per share. These shares were purchased in an arm's length transaction from a group that previously had controlled the company. These purchases gave the Simkins ownership of approximately one-third of the outstanding shares plus the right to elect a majority of the board of directors.

Both sides claim these purchases support their positions. Plaintiff contends that an average selling price of $4.64 per share in July, 1963, at a time when the company was losing money is evidence that a $4.50 price was too low in January, 1964, when the unaudited first-quarter figures showed a profit. Defendants emphasize the $4.45 price per share for the largest block of stock acquired in July, 1963. Moreover, they point out that this price includes a substantial premium for the degree of control the Simkins acquired by the 1963 purchase. On the issue of control, plaintiff concedes that control is worth a substantial premium, but contends that a factor for control should be added to price per share at the time of the challenged January, 1964, transaction to reflect the fact that the Simkins at that time acquired stock that gave them ownership of more than two-thirds of the outstanding shares.

█ Clearly elements of control were acquired by the Simkins both in 1963 and in 1964. In the circumstances of

this company and the status and distribution of its outstanding shares, it seems reasonable to conclude that the control acquired in 1964 was worth a considerably smaller premium than the value of the control that had previously been acquired in 1963. See Dasho v. Susquehanna Corp., 461 F.2d 11 (7th Cir. 1972); Vanadium Corporation of America v. Susquehanna Corp., 203 F. Supp. 686 (D.Del.1962). In view of all the circumstances, a purchase at an average price of $4.64 in July, 1963, which conveyed effective corporate control, followed by continuing losses for the balance of fiscal 1963 that were reversed only by a modest profit of disputed amount in the first month of the first quarter of fiscal 1964, does not provide a basis for concluding that $4.50 per share in January, 1964, was not a fair price.[9]

Against the plaintiff's evidence,[10] the defendants offered the testimony of their independent financial expert, Professor Pierson Hunt, of the Harvard Graduate School of Business Administration. He offered an analysis quite different from that of Dr. Bellemore. Professor Hunt acknowledged that he was not endeavoring to determine a precise market value for New Haven shares. Instead he sought to determine, by what he called a "discounting flows" analysis, whether the merger price of $4.50 per share was too low.

Like Dr. Bellemore, Professor Hunt began by estimating the likely earnings of the company from the date of the merger (but without assuming that the merger occurred). But Professor Hunt did not simply multiply the unaudited first-quarter earnings by three to estimate earnings for one year. Instead, he projected earnings well into the future based on predicted sales. Making what he termed optimistic assumptions, he estimated gradually increasing sales and calculated earnings by using percentages of earnings to sales drawn from tables reporting such percentages for companies in the industry with financial characteristics comparable to New Haven. He selected 1.07% for the first year. This was the percentage, in a ranking of percentages of companies in the industry, that marked the line between the third and fourth quartile of the companies analyzed. On assumed sales of $21 million, he calculated first-year profits at $224,700.[11] Actually he used approximately half this figure in his subsequent

---

9. In addition to the July, 1963, purchase at an average price of $4.64 per share, plaintiff also relies on a transaction in April, 1962, when the controlling group acquired the shares it later sold to the Simkins. The price per share for the April, 1962, transaction was $6.00. There is little if any evidential weight to this earlier transaction. The company continued to experience heavy losses between the transactions. Moreover, the more recent July, 1963, transaction gives better evidence of what a willing buyer would pay in early 1964, taking into account the control acquired in 1963 and the continuing losses that followed the 1963 purchase.

10. Plaintiff also contends, somewhat as an afterthought, that a price per share in excess of $4.50 is established by adding to the over-the-counter bid price of $4.50 "profits and assets" of $2.05½ per share, represented by certain assets and transactions that plaintiff alleges were not properly reflected in the materials sent to New Haven shareholders at the time of the merger (plaintiff's reply brief after trial, p. 86). The attempt fails for two reasons. First, there is no evidence that the over-the-counter bid price of $4.50 per share represents real market value to which any other elements of value can be added. What evidence there is points to the conclusion that, apart from the Simkins, who wanted to acquire a majority position in the stock of a company they were already controlling and operating, there was no one else with any interest in purchasing New Haven shares at $4.50. See Norte & Co. v. Huffines, supra, 288 F.Supp. at 859, rejecting market price as evidence of fair value in a thin market. Second, no claim was made that a price per share in excess of $4.50 could be established by net asset values, plus whatever per share increment could be accepted from plaintiff's claim of undisclosed "profits and assets" of $2.05½ per share.

11. While Professor Hunt was firmly of the view that a capitalization of earnings approach would be inappropriate based on a projection from the unaudited report of a single quarter, it is interesting to note that

analysis since almost half of the then current fiscal year had elapsed by the time of the merger. For the next five years thereafter, he assumed a 5% growth in sales and a percentage of earnings to sales that increased gradually each year until it reached the average for the industry of 2.67%. Applying these increasing percentages to the increasing sales, he computed earnings for six years and then assumed constant earnings thereafter into the future. He then adjusted for taxes to take into account the eventual using up of the company's tax loss.

At that point, Professor Hunt's analysis makes another significant departure from Dr. Bellemore's. Instead of capitalizing earnings for the first year, or even the average of several years, by a selected price-earnings ratio, Professor Hunt endeavored to compare the present value of the future anticipated earnings with the value of the investment represented by the number of shares outstanding prior to the merger priced at an assumed price per share of $4.50. He determined from a standard table that the appropriate "discount value factor" that would relate the projected earnings (to be realized in both dividends and stock appreciation) to the assumed value of the investment in the outstanding shares was 25%. Considering this percentage as an index of "riskiness," he concluded that $4.50 per share was certainly not too low, and, if anything, was perhaps too high, since the 25% factor was somewhat higher than alternative, less risky investment opportunities. In other words, he thought a reasonable investor

would probably have balked at paying $4.50 per share upon learning that 25% is the discount factor that relates the present value of projected earnings to his investment. The riskiness of realizing projected earnings equivalent to a discounted value factor of 25% would warrant an investment at a somewhat lower price (or at the same price in a less risky company) at which the risk of realizing the projected profits would be more acceptable.[12]

This final stage of the analysis, while conceptually interesting, must frankly be recognized as involving a very subjective judgment. Having found that the discounted value of the projected earnings compared to value of the investment is high compared to most stocks, Professor Hunt then made the value judgment that, despite this high discount factor, the risks inherent in New Haven's situation made it an unattractive investment at $4.50. It was his opinion that only at an even higher discount figure, such as 30%, would the risks of the New Haven situation justify an investment. Obviously, this higher rate could result from either increasing earnings in the computation or decreasing price below the assumed price of $4.50. But the critical judgment is the one Professor Hunt made when he concluded that New Haven was too risky a company to justify an investment at a $4.50 price per share.

Despite the subjective element in the analysis, Professor Hunt's testimony remains far more persuasive than Dr. Bellemore's. Because of the inappropriateness of a price-earnings ratio analysis

if Dr. Bellemore's capitalization ratio is applied to Professor Hunt's projection of first full year earnings, the resulting price per share is slightly below the merger price of $4.50. Dr. Bellemore projected first-year earnings at $445,700 and arrived at a price per share of $7.50 to which he added a 15% premium for control. Projected earnings of $224,000, as estimated by Professor Hunt, would produce, with Dr. Bellemore's ratio, a price of $3.77, to which a modest premium for the extra control beyond what the Simkins had already acquired would leave the to-

tal price below $4.50. From the perspective of January, 1964, Professor Hunt's projection of first-year earnings is far more realistic than Dr. Bellemore's.

12. At a lower price per share, the discount value factor would be a higher rate, but Professor Hunt's point was that at a sufficiently high rate, an investor would find it worth taking the risks inherent in a New Haven investment, compared to comparable investment opportunities.

**150**

and the glaring defects in the particular analysis made by Dr. Bellemore, his conclusion lacks persuasive weight. On the other hand, Professor Hunt's analysis provides a substantial basis for concluding that $4.50 per share was not less than the price reasonably to be paid as the fair value for the investment opportunity represented by the New Haven shares issued in the merger. To the extent his conclusion involved a subjective evaluation, that evaluation was based on a careful consideration of the company's prospects, giving due weight to its past financial difficulties and its prospects for improved performance under capable management.

Defendants also offered the testimony of Leon Simkins, president of the company, and Attorney William Gumbart, a director. Both witnesses, in view of their roles with the company and their status as defendants in the case, have an obvious interest in the outcome. Even when their testimony is assessed with this consideration in mind, their testimony is extremely credible and persuasive. Simkins impresses as an honest and capable businessman. He considered the $4.50 bid price on the over-the-counter market to be somewhat high and artificial in the absence of trading, but was reluctantly willing to accept it. Gumbart impresses as a wise and experienced observer of the company and of the state of the market for the company's shares. He testified that the alleged market at $4.50 per share was high, that few shares could be sold, and that no investors were putting money into the company's stock at any price.

Neither side attempted to establish fair market value by any other measure than those already discussed. While plaintiff complains that defendants offered no evidence of what the fair market value was, their evidence was presented not to prove a precise fair market value but to show that the fair market value was not in excess of $4.50. As can be seen, all of the evidence, while lengthy, is not entirely satisfactory. Nevertheless, assessing all of the evidence, this Court comes to the firm conclusion that even if defendants bear the burden of proof on the state claims, the New Haven shares issued at the time of the merger did not have a fair market value in excess of the merger price of $4.50 per share.

Since this conclusion defeats all of plaintiff's claims for damages and since the absence of any damages defeats both of plaintiff's causes of action, judgment will enter for the defendants denying all of plaintiff's claims for relief.