# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 89-CA-01202-SCT

*AQUA-CULTURE TECHNOLOGIES, LTD., JACK SUMMERS, JOHN HAIGH, HENRY REED AND DR. MILTON SEGAL*

*v.*

*DR. SANDRA F. HOLLY*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/29/89 |
| TRIAL JUDGE: | HON. R.P. SUGG |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | MICHAEL FARRELL |
| | DAVID M. MCMULLAN, JR. |
| ATTORNEYS FOR APPELLEE: | JOHN G. CORLEW |
| | VIRGINIA T. MUNFORD |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 5/30/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 6/20/96 |

**EN BANC.**

**PRATHER, PRESIDING JUSTICE, FOR THE COURT:**

¶1. This is an appeal of a $245,819.36 judgment of the First Judicial District of Hinds County Chancery Court entered against International Mari-Culture Technologies, Ltd. (IMT), Jack Summers, John Haigh and Aqua-Culture Technologies, Ltd. (ATL), in favor of IMT shareholders and their representative, Dr. Sandra Holly, in a shareholder derivative action.[1] Dr. Holly alleged that certain IMT officers and directors seized corporate opportunities from IMT to form a new company, ATL, from the remnants of IMT.

¶2. The Chancellor entered a judgment against Jack Summers, John Haigh and ATL for $245,819.36, consisting of $175,000 in damages, $65,000 in attorneys' fees and $5,819.36 in expenses. The original judgment limited the recovery of damages to the five IMT stockholders who did not hold ATL stock but was modified by the Chancellor the next day to include recovery by all IMT stockholders.

¶3. We affirm the appeal. On cross-appeal we affirm in part and reverse and remand to modify the judgment to bar John Haigh as an IMT shareholder from recovering a percentage of the judgment.

## FACTS

¶4. In July of 1983, Dr. Wesley Prater, M.D., and Dr. Cortez McFarland, M.D., of Jackson became interested in investing in the new and growing catfish farming industry. They sought to develop a farming and processing operation that could be successfully marketed to third world countries, particularly Africa, envisioning a large return from their investment in helping develop a renewable food source. They inspected Ed Scott's catfish farm in the Mississippi Delta and became familiar with his farming process.

¶5. Realizing that they needed major capital investment, they contacted Jim Evans of Jackson, who introduced the doctors to Ron Hobbs. Hobbs discussed Prater's and McFarland's plans with several business associates, including Jack Summers, who told Hobbs that he had been a marketing consultant for 170 of the Fortune 500 companies and had contacts with several African leaders who would be helpful in marketing the catfish farming technology. Summers also claimed that he had access to almost any president or minister (cabinet member) on the continent of Africa. Prater and McFarland paid for Summers to visit Jackson. Summers told them of his extensive contacts in Africa , and he later brought three Namibian leaders to Jackson to discuss exporting catfish farming technology to Namibia.

¶6. Jackson Minority Business Development Center (JMBDC) was a government-sponsored business development organization that served as a business incubator for small minority-owned businesses. Milton Chambliss, its assistant director, attended a meeting in November, 1983, with Summers, Hobbs, Prater, McFarland, and J. B. Burrell, the director of JMBDC. Summers explained to them the necessity of developing a prototype for potential investors, as well as the need for building a training center for the planned activities. Scott's operation was used in the drafting of IMT's original marketing analysis and strategy, but Scott was unable to continue for financial reasons. Chambliss then contacted Henry Reed, a catfish farmer from Belzoni, who agreed to participate in the enterprise.

¶7. Summers indicated that he needed "seed money," and Prater and McFarland made an initial investment of $22,500. Summers wrote them that the investment was "to be utilized as an investment to offset the expenses of the newly organized [IMT]." Dr. Prater testified that they eventually invested $50,000, which they considered "seed money" and expected to be paid back once IMT began to return a profit. In a December 27, 1983, letter under an IMT letterhead, Summers wrote Evans, Hobbs, McFarland and Prater that "[t]his memo will serve as written confirmation of our agreement regarding equity distribution of [IMT] ." The memo continued:

> The above named five (5) individuals [Evans, Hobbs, McFarland, Prater, Summers] each in his own right owns sixteen percent (16%) of the outstanding and issued shares of IMT. This totals ninety percent (90%) of the total outstanding equity. The remaining ten percent (10%) as well as all authorized but unissued equity will be authorized and issued at the time required.

> It is understood that this equity arrangement honors all previous commitments with regard to raising capital and payment of fees in cash and equity.

> The remaining ten percent (10%) of the authorized and issued equity will be immediately for additional expense fund investors.

This agreement clearly states the total agreements of all parties concerned. Modifications to this agreement will be made only as stated in preexisting agreements or by majority vote of the board of directors.

Evans and Hobbs each received sixteen percent (16%) ownership of IMT in return for their work in arranging for financing with New York investment and brokerage companies, while Summers received the same percentage for his efforts in marketing IMT to his African contacts. Under the parties' agreement, Summers was to receive no salary, but IMT would pay for all of his expenses. Prater and McFarland were voted the same percentage of ownership for their investment, but they never received stock certificates.

¶8. Summers filed IMT's certificate of incorporation in Delaware on January 27, 1984, authorizing one million common shares without par value. Summers was also developing a marketing plan to familiarize investors and prospective investors with IMT. In early 1984, financed by "seed money," Summers made his first trip to Africa, England and Belgium. In a memo dated April 5, 1984, to Hobbs, Evans, McFarland and Prater, Summers described his progress with IMT marketing:

Enclosed preliminary tlx [telex] from Sierra Leone, West Africa, advising status of confirmation from ministers of Sierra Leone and Ivory Coast for adoption of the fish farming project (Tonkolili Trout is West African name given to our project).

With the week, we except [sic] confirmation from the ministers of no less than five (5) West African countries [sic] for the fish farm program. It is further anticipated that including southern Africa and West Africa We can count on at least ten (10) projects this calender year.

I plan to return to the states on o ur [sic] about 20 April.

The telex was addressed, however, to John Haigh, a business associate of Summers' who later became a board member and stockholder. The telex, sent by two of Haigh's associates, stated:

Ref. Tonkolili Trout Minister of Development in Washington but have got in touch with him so expect telex this afternoon or first thing tomorrow morning.

Also expect one more by Thursday from the Minister of Rural Development of the Ivory Coast. Hope to hear from you. Also expect some more telexes from West and Central Africa Shortly.

On a memo sent to Ron Hobbs, Summers hand wrote a personal note to him:

Ron, Sorry for the lack of communication - much work & problems, but we are underway - we (confidential) have Aqua-Culture Technologies Ltd. Jersey U.K. (offshore) organized. JS

Hobbs was bothered when he received this note. At trial, Summers, when asked why the organization of Aqua-Culture Technologies Ltd., Jersey, U.K. (ATLUK) was confidential, replied:

A: Because confidential between Haigh, Hobbs and I. We were organizing then, and we were just doing it confidentially.

Q: Weren't you going to use it in conjunction with IMT?

A: Of course. It was going to be the international holding company for IMT.

Q: Why weren't the other shareholders and directors of IMT entitled to know that this organization had been created?

A: Excuse me, sir. The board of directors of IMT authorized it.

Q: Okay. So now you're saying it's not confidential between you, Hobbs and Haigh, but that you were really acting pursuant to the instructions of the board of directors of IMT?

A: My note that said "Confidential" was just that this was a confidential communication between us, and I'm sure we were allowed to do that. I think it might be easier for you, sir, if you were to check with all our legal counsel to see if any of these companies really do exist and where they're at, or if they be filed with any government entities. And I think you would rest your case very quickly.

¶9. Summers testified that ATLUK was organized but never filed, and that there was thus no such company in existence. Hobbs, however, testified that it was Summers' intent to keep ATLUK confidential from the other IMT Board members. Hobbs informed the IMT Board and management group that ATLUK had been organized and that Summers considered it confidential information. Summers admitted to the Board that he had said that it was confidential but considered it to be of no consequence.

¶10. Summers informed Hobbs that ATLUK was established because, from past experience, there is a greater likelihood of cooperation with African business and political leaders when they can realize their financial gain in a country other than the one in which they are domiciled. Summers stated that ATLUK would be utilized to make payments to contractors and suppliers that assisted with IMT business in Africa and abroad. This matter was discussed at length at an IMT Board meeting with Summers present, but ATLUK was never actually utilized by IMT during its existence.

¶11. Soon after sending the April 5 memo, Summers sent John Haigh the following telex:

Attn: John Haigh

On Wednesday, April 18, Ron Hobbs and I will be flying to Jackson, Mississippi, for a board meeting of directors of [IMT]. We plan at this meeting to get approval to set up the international sales and marketing co. (as discussed in Jersey, etc.) and to confirm you as a director of the American (Mari-Culture) as well as internation al [sic] sales and marketing co. (Aqua-Culture) to do this we must have the tlx you sent yesterday slightly reworded and sent to me in NY, separately first thing Tuesday morning, 17 April.

Your Tlx text should read:

RE: Tonkilili Trout (catfish).

With regard to commitments expressed we expect confirmation letters from the ministers of development of: Sierra Leone, Guinea, and Ivory Coast. We are well advanced in negotiations with several other countries and expect word of their direct interest shortly with regard to interest expressed by Namibia and other states of Southern Africa[.] [W]e leave that to the handling of your people in charge in that part of Africa.

Please advise us of your board meeting in Jackson Missippi [sic] so that we may procede [sic] with

our sales and marketing program initiated with you these last three months. With regard to the expenses incurred and the fees discussed, we await you [sic] further word and disposition after discussion with your American group. Pls keep in m ind [sic] it is the intention of all of us to keep as much of the equity within our own groupand [sic] preclude the need for outside expense support. We concur with you that the large scale financing of each project will more than substancially [sic] cover all possible expenses and fees whiule [sic] returning a lucrative profit to the company group. Pls give me you reply by Thursday 19 April.

Best Regards,

John Haigh

West Africa Port Management

Hobbs testified that Summers presented this document to him.

¶12. On April 18, 1984, IMT held its first official board of directors meeting, at the Holiday Inn-Downtown in Jackson. The minutes of the meeting noted that Summers, Hobbs, Prater, McFarland, and Evans were present, as well as Burrell and Chambliss, who recorded the minutes. Summers chaired the meeting, which adopted the marketing plan that Summers, assisted by Burrell, had drafted, entitled "The Grain-Fed, Farm-Raised Catfish Industry: A Marketing Analysis and Strategy Plan."

¶13. The marketing plan was to introduce prospects to IMT's project and goals, and included an artist's depiction of an IMT prototype catfish farm. The identical plan was found later in an ATL document. The Board also discussed marketing strategies and proposed offices in Jackson, as well as plans for international offices in New York and the United Kingdom (U.K.). In addition, Haigh was approved as a new member of the IMT board at this meeting, and the parties also reviewed the various expenses incurred with regard to the operation. The expense report showed that the following expenses had been incurred as of April 18, 1984:

Organization and preparation and completion of marketing presentation $38,000

Travel, Expenses, Research and Staff Time $ 6,600

International Sales and Marketing (including travel, entertainment, and material) $ 27,800

Washington expenses $ 5,000

Material for African program $ 2,500

Misc. United States expenses $ 6,500

Legal Expenses $ 1,825

Jackson Operating expenses $ 6,500

Total Operating Expenses to Date $ 94,725

Projected expenses from April through June, 1984, were:

Operating Expenses - $ 50,000

Travel Expenses $ 30,000

Miscellaneous Expenses $ 20,000

Total Projected Operating Expenses $100,000

IMT assets were also listed:

Paid in by two directors $ 35,000

Paid by and due three directors $ 8,325

Paid by and due one director, of which $30,00 has to be repaid as soon as possible (within the current period) $ 51,400

Total Capital Sources to date $ 94,725

¶14. At the meeting, the Board authorized issuance of 800,000 shares, including 50,000 shares to each of the six directors. The board also agreed that, in the event of the formation of a marketing company, 160,000 to 200,000 shares would be issued if authorized by securities law. The remainder of the authorized corporate shares were to be sold at $1.25 a share.

¶15. The Board selected Burrell as the business manager and Chambliss as secretary, each receiving 25,000 shares in exchange for his services. Chambliss and Summers were placed in charge of issuing stock to new investors, and Chambliss kept a tally of shareholders. When someone invested in IMT, Chambliss would send him a letter acknowledging receipt of the investment and stating the amount invested and the number of shares he owned. Summers kept the stock records in New York and would send the stock certificates to Chambliss for him and Reed to sign and distribute.

¶16. Summers said that Chambliss was the only person authorized to issue stock, even though Summers kept the stock register with him in New York. There were shares registered by Summers that were not listed on Chambliss' shareholder list. For example, Summers' records showed that he owned 290,000 IMT shares, while Chambliss only recorded 125,000 in Summers' name. Summers' stock register also showed that he held 275,000 IMT shares through L'aiglon Holdings, Ltd., but, according to the minutes, the Board never authorized issuing Summers more than 50,000 shares.

¶17. Summers was also authorized by the Board to maintain bank accounts, and accounts were opened in Jackson at State Mutual Savings & Loan Association, at River Oaks Bank in Houston, Texas, and at Chase Manhattan Bank in New York. Summers explained that the River Oaks account was opened because he wanted to interest its bank president, James Lyon, in investing in IMT. Summers stated that the Chase Manhattan account was opened when River Oaks closed IMT's account after several checks bounced, and Hobbs later learned that Summers' checks were being returned because of insufficient funds.

¶18. Summers had signature authority on all accounts, while Chambliss only had signature authority with the State Mutual account. Hobbs had signature authority with the River Oaks and Chase Manhattan account, but had no access to the checkbooks because they were kept by Summers. Bank statements from River Oaks and Chase Manhattan were sent to Summers and were not reviewed by any other IMT shareholder

or officer. The State Mutual account always held less than ten thousand dollars ($10,000), given that Summers would instruct Chambliss to withdraw any money in excess of $10,000 and send it to him.

¶19. Henry Reed become interested in IMT through Burrell and Chambliss. Chambliss invited Reed to become an IMT board member and attend a board meeting in Jackson May 9, 1984. Reed signed a letter dated May 2, 1984, accepting the appointment. At the May 9 meeting, Hobbs told Reed that he had to invest approximately $26,000 in order to become a member of the IMT Board. Reed asked if the other board members paid that amount and Hobbs replied that they had. Reed invested $40,000 in IMT in order to become a shareholder. In a list of IMT shareholders as of April 10, 1985, prepared by Chambliss, Reed is listed as purchasing 26,000 shares at $1.25 for a total price of $32,500 on April 19, 1984. He received a bonus of 10,000 shares for services rendered as a board member and as president of IMT, giving him a total of 36,000 shares. Reed and some friends, listed as Henry Reed & Associates, also bought 7,000 shares at $1.25 for a total price of $8,750. Reed, together with his investment group, invested a total of $41,250 in IMT.

¶20. At the May 9 meeting, the IMT Board discussed Dr. Sandra Holly, who had been recruited by Burrell, as a potential investor. Summers testified that the IMT Board was interested in her becoming a member, but she conditioned her selection on the removal of Prater and McFarland because they were being sued for medical malpractice and she did not want to be associated with them professionally. The Board agreed to remove them as directors and ruled that they could not be active in IMT.

¶21. Prater stated that he was never able to reach Summers after this meeting and that Summers instructed Chambliss not to release the minutes of the board meetings or any stock certificates to him or McFarland. The Board reorganized and elected a new Board of Directors, which included Summers, Hobbs, Evans, Haigh and Reed. Dr. Holly was also offered a position on the IMT Board if she so desired. The Board authorized issuance of the remaining authorized shares at the price of $1.50-$2.00.

¶22. A May 12, 1984, meeting, the board of directors discussed a proposed training facility for customers, as well as a proposed conference center. IMT began to take shape as an emerging small growth company. Burrell and Chambliss, working out of JMBDC, contacted potential investors and handled IMT's local business operations. Summers continued his marketing efforts by sending letters to various African countries. He developed a relationship with Sierra Leone, Zaire, Guinea and the Ivory Coast. Summers' stated ultimate goal was to secure letters of commitments from potential clients, and encourage major investment in IMT. Hobbs had contacts with financial institutions, brokerage firms and government agencies, hoping to secure immediate financing when needed.

¶23. On June 6, 1984, Dr. Holly bought 22,000 shares at $1.25 a share, totaling $27,500, and representing approximately ten percent of IMT's issued shares. She attended her first IMT Board meeting July 23, 1984. Chambliss' shareholder list revealed IMT investors who bought stock at $1.50 per share from May 22, 1984 to July 20, 1984:

No. of Date Shares Total

**Name Purchased Purchased Value**

Roy DeBerry 5/22/84 3334 $ 5,000

Larry Segal 7/11/84 6667 $10,000

Fred Buie 5/31/84 1334 $ 2,000

Booker T. Brown 7/11/84 3334 $ 5,000

James Haskins 7/20/84 4000 $ 6,000

William Green 7/06/84 2000 $ 3,000

Paul Merl . 7/20/84 10000 $15,000

J. Sonneville 7/20/84 2500 $ 3,750

¶24. When a new investor made his payment or when State Mutual's account balance was greater than a thousand dollars, Summers would instruct Chambliss to send the investor's payment or the remainder over ten thousand to New York by overnight express.

¶25. At the July 23 meeting, Summers gave a report of IMT's expenditures, which were reviewed and approved. Summers testified that it was the Board's "policy to review the expenses since the previous meeting and to review the projections that the various persons involved would give. And the board discussed them, and any comments that they had, they reiterated, and either approved it or disapproved it." A stock dividend was declared as follows: Summers - 15,000 shares; Hobbs, Haigh, Reed, Burrell and Chambliss - 10,000 shares each. The Board elected Reed president; Chambliss, vice-president/secretary; and Burrell, business manager. They also discussed an office location for IMT in Jackson. Dr. Holly wanted IMT to move into a building she owned, but the Board refused her offer.

¶26. Summers presented a letter from Sierra Leone, which stated:

Your letter dated 6th July, 1984 together with its attachments addressed to the Honorable Dr. Sheku Kanu, Minister of Development and Economic Planning has been well received.

The Planning Unit has granted initial approval for the [IMT] Programme. President Stevens' Office will correspond directly with Mr. John Haig [sic] in the U.K. with his personal approval.

The programme procedures will be established with the Mari-Culture groups' advice.

s/D A B Minah

AG Development Secretary

¶27. At the October 18 IMT Board meeting, several officers and directors expressed reservations about Summers' accounting practices, specifically his failing to provide receipts to substantiate his expenses. Summers explained how his expenses were handled:

Q: What were your arrangements, if any, with IMT about expenses?

A: They were to cover all the expenses involved in my work with IMT.

Q: How was that handled in terms of -- how did you get reimbursed for expenses?

A: Well, the expenses were always included as part of the budget, and they were always both

preapproved and then approved again afterwards, after they were spent, so it was always indicated in all these meetings what the budget would be. I always gave them a budget.

Q: Did you get any kind of cash advance for expenses?

A: Only when travel was necessary.

¶28. Hobbs testified that, when Summers was questioned why he would not provide receipts for his expenses, "he took the position that they were petty questions and that in fact his function was at such a level that he ought not to be questioned." Summers nevertheless promised to provide receipts, but he never did. When a board member questioned Summers' budget request, he responded, "Why would you question me at a time like this? You know I have to be in Africa. You must trust me." Chambliss testified that Summers would become "extremely hostile" when he was asked about receipts for expenses, and would threaten to leave IMT.

¶29. The October 18 meeting minutes entitled "Accounting since 7/23/84" contain the following figures:

$460,000 deposited

$94,000 expended

$34,000 deficit

¶30. To improve financial accounting, Hobbs suggested that IMT hire a certified public accountant to prepare a financial statement. Kessler, Blum & Company (Kessler, Blum) of Great Neck, New York, was selected by Summers, and approved by the Board. Summers was the only IMT officer or director to provide financial information to Kessler, Blum, and he claimed that all of his expense receipts and bank statements were sent to Kessler, Blum.

¶31. The Board also discussed letters from Senegal, Sierra Leone, Guinea, and Zaire expressing interest in IMT's project. The letter to Summers from Zaire was from an associate who was organizing a company in Zaire to become associated with IMT, later to be named IMT-Zaire.

¶32. On November 1, 1984, IMT released a marketing update:

The IMT aqua-culture program has been selectively presented to twenty (20) nations. Fifteen (15) of those nations have expressed positive interest in the IMT program.

Ministerial level commitments permit us to make the assumption that in 1985, IMT client/nations will have put into the final stages of completion, bankable documents representing two to three hundred million ($200,000,000 - $300,000,000) U.S. dollars, for the purchase and utilization of IMT technology.

The international technology marketing program estimates do not consider any sales or income from other sources of IMT activity, which include:

The feasibility study phase of the international technology marketing program.

The retail sales area, which from just a few estimated eastern markets, could produce well over one

hundred and fifty thousand ($150,000) U.S. dollars monthly.

The above represents the best estimates of IMT activities. It is important to note that we have made only selective approaches to prospective countries. Our plans for 1985 call for instituting a formal IMT organization and launching an accelerated marketing effort.

¶33. In November, 1984, Chambliss met Summers in Zaire to further promote IMT. Summers wanted a black Mississippian who was familiar with the catfish industry to accompany him in his marketing efforts. Summers and Chambliss met with several government officials, and also discussed the project with representatives of the Detroit Diesel Division of General Motors, who expressed interest in supplying equipment. Summers and Chambliss appeared on a Zaire television program to explain IMT and its program. Chambliss prepared a memo reporting on the trip to Zaire and presented it to IMT shareholders on December 6, 1984, in which he asserted that the "IMT marketing strategy is effective and that it will enable us to carry our prototype catfish program forward throughout Western Africa." Summers, on the other hand, testified that "we had no backup, we had no organization, we had no technical support -- we had nothing. The marketing was good, but it started to look like a sham, and I started to get a little embarrassed, actually."

¶34. At the March 5, 1985, meeting, the Board discussed developments in Zaire and efforts to secure a "hard copy" contract there. Hobbs reported he had investors positioned to give IMT a major capital infusion once letters of intent -- "hard copy" contracts -- were secured. Freedom National Bank, Thomas Funding Corporation, World Bank, International Monetary Fund, Export/Import Bank and Equitable Life Insurance Company were poised to finance IMT's project once IMT received letters of intent or contracts from interested countries. Summers estimated that, over the next five years, IMT would have $500 million in contracts. Summers and Hobbs explained to the Board the financial statement prepared by Kessler, Blum, but Dr. Holly complained that the statement was not audited. She demanded a certified audited statement and specifically wanted to see Summers' receipts, which he said were sent to Kessler, Blum.

¶35. In April, 1985, Summers secured a contract with Zaire to develop five catfish farms, including all ancillary supplies and equipment, for a total of one hundred million dollars ($100,000,000). He received a letter from his liaison in Zaire informing him that Zaire's Department of Agriculture wanted IMT to complete a feasibility study of their project, the first step in establishing the catfish farming operation. Summers represented that he had commitments from Sierra Leone and the Ivory Coast as well.

¶36. Summers returned from Africa and went to Jackson to make a report and introduce Jim Bennett and John Haigh to the Board. Summers proposed Bennett as president of IMT, and the Board elected Bennett president. Summers testified that Hobbs was actually the one who wanted Bennett as president. On May 29, 1985, Summers sent a progress report to IMT stockholders reporting on the contract with Zaire and stating that he was returning to Africa to secure further commitments. He also informed stockholders that the Zaire government had given IMT a forty-nine percent (49%) interest in IMT-Zaire and that IMT had "completed an association with General Motors to provide technical backup and feasibility assistance." Summers also noted that Bennett was the Chief Executive Officer and President of IMT. Burrell and Chambliss would operate IMT in Jackson, while Lawrence Segal and Kevin Feldman would work for IMT in New York.

¶37. Summers instructed Burrell and Chambliss to draft a budget for the Jackson office and include a salary for them. This was encouraging to them, given that they would be able to leave JMBDC and work full time

for IMT. Chambliss spoke with Summers briefly and was instructed to work through Bennett. Chambliss sent Summers information on potential investors in Nashville, but Summers never responded.

¶38. Dr. Holly made her final investment payment of $4,000 at the last Board meeting. Summers wanted Chambliss to withdraw the $4,000 in cash as soon as possible. Chambliss withdrew the money, handed it to Hobbs, who signed a receipt for the money and gave the $4,000 to Summers. Chambliss lost confidence in Summers' integrity after this. Hobbs did not go to Jackson for the last board meeting because of a dispute with Summers about his accounting practices.[2] Summers refused to turn in his checkbooks, and IMT's bank statements from River Oaks and Chase Manhattan went to Summers' residence in New York and no one else saw them. Hobbs only wrote three checks on the account, one of which was to cover a $4,000 bill to American Express for a card belonging to Summers' daughter, Jodi.

¶39. At trial in March, 1989, checks totaling $17,893.08 written by Summers on the IMT account to the Delmonico Hotel were introduced. IMT checks in excess of $44,000 were payable to cash and were endorsed by either Summers or one of his three children. There was also a $4,900 check for deposit to the Scott Organization and checks in the amount of $5,850 were payable to two of Summers' family members. From January 14, 1985, until June 17, 1985, twenty-five cash withdrawals totaling $15,790 were made from the automatic teller machine against the IMT account with Chase Manhattan. These withdrawals together with the others totaled $78,433.08, and were not related to IMT expenses.

¶40. Shortly thereafter, Hobbs went to Jackson alone to meet with Reed, Burrell, Chambliss and Holly. He told them that he was having trouble with Summers. Summers called Dr. Holly in May, 1985 and asked her to meet Reed and him in Memphis without the other board members knowledge, but she declined. In a letter from Summers to Dr. Holly dated May 30, 1985, from Brussels, Belgium, Summers expressed serious concerns about IMT employees and operations and explained the change in officers, but he ended the letter saying that he was determined to make IMT a success. After receiving this letter, Dr. Holly tried without success to contact Bennett and Summers. Dr. Holly resigned from the IMT Board in June, 1985, and Hobbs, Reed and Chambliss resigned in November of 1985.

¶41. Summers testified that:

> (He) came to the conclusion that nobody was going to deliver what they said they were going to deliver, the company was nowhere near being financed, we still had no office. In fact, not only did we not have an office, but the Minority Development Office or Minority Office in Jackson which Chambliss and Burrell were using was suddenly not available because they had lost -- I don't know if they lost it, but they were no longer involved with that federal minority program, so there was no office, no phone. There was nothing, and nobody made any provisions for anything else.

Summers said he recognized IMT was falling apart when the directors began to resign. Several IMT stockholders concerned with IMT's status attempted without success to contact Summers through phone calls or letters. Hobbs sent the following certified letter to Summers on November 5, 1985:

> Dear Jack:
>
> I am dumbfounded that you have not responded to my letters of September 26 and October 11, and that I have heard no word whatsoever from your office.
>
> Are you ill, or traveling, if so, please have someone from your office communicate with me and the

company shareholders.

Jack, I insist on some word from you, or a representative of the company within ten days. You have accepted a fiduciary responsibility, and your lack of communication is most inappropriate.

s/Ron Hobbs

¶42. Summers incorporated Aqua-Culture Technologies, Ltd. (ATL), June 14, 1985, and took John Haigh, Jim Bennett, Henry Reed and Dr. Milton Segal with him to further develop the business relationships which he established in Africa while acting for IMT. In a letter to Mr. Januier Ngirunpatse dated September 3, 1985, Summers wrote that "we concluded with success our negotiations in Sierra Leone for five farms" and were in discussions with Gambia, Senegal and the Ivory Coast concerning similar projects. ATL held a meeting on November 10, 1985, in Sierra Leone in which the group, including Haigh and Summers, discussed forming a company in Sierra Leone named IMT-Sierra Leone to develop a catfish farming industry. IMT-Sierra Leone was incorporated on January 13, 1986, but later had its name changed to ATL-Sierra Leone. According to the minutes, Haigh explained that the parent company [ATL] of New York had over the years perfected this particular industry and had marketed the process through an associated company named International Mari-Culture Technologies (Overseas), Ltd. (IMTOS), to many tropical developing countries.

¶43. In a letter dated November 24, 1985, Summers sent various former and present IMT shareholders a private placement memorandum dated September 23, 1985, describing ATL and offering them ATL stock at one cent a share. Summers testified that all of the original IMT shareholders, with the exception of the Brown brothers, accepted ATL's offer. Prater was not offered stock in ATL.

¶44. The memorandum stated that ATL "is a company organized for the purpose of developing and exploiting the farm-raised fish (specifically catfish) market . . . [and] dedicated to the expansion into export markets of this renewable food source technology to countries throughout the world that are in need of food, especially high-protein food." The memo also discussed agreements with General Motors' Detroit Diesel Division to provide technical and mechanical assistance for the ATL project. ATL's assets were listed at $545,300 and the three-year projected income for ATL before taxes was $4,100,000, $9,700,000 and $14,900,000. Summers testified that this original private placement memorandum was replaced by another one dated March 21, 1986, given that the original memorandum contained inaccuracies.

¶45. Dr. Holly received a copy of the letter with the private placement memorandum for ATL, and for the first time realized that Summers was no longer with IMT. The memorandum was very similar to the IMT marketing plan that she had read in 1984. Chambliss testified that the illustration in IMT's marketing plan depicting a catfish farm prototype was the same illustration used in ATL's private placement memorandum. Dr. Holly bought $275 worth of ATL stock in order to find out what Summers was doing. She received an ATL newsletter in January, 1986, and discovered that ATL was carrying forward IMT's concept of developing catfish farming technology in Africa. The newsletter informed shareholders that ongoing discussions were taking place with Portugal and Belgium for installing ATL projects and that marketing programs were being completed for Zaire, Sierra Leone, Gambia, Ivory Coast, Indonesia and several other African nations. The newsletter projected $500,000,000 in project sales and another $500,000,000 to be concluded within the next eighteen months.

¶46. The ATL newsletter of April, 1986, contained a photograph of three hostesses wearing T-shirts with

an ATL logo on the front at the Intercontinental Hotel on Kinshasa, Zaire, for the launching of an ATL project. In the middle of the logo was a catfish and above it printed "Zaire-USA" and below it "IMT-Zaire Aquaculture."

¶47. ATL's growth and development mirrored IMT's program goals. ATL had begun projects in Zaire and Sierra Leone and had ongoing discussions with Senegal, the Ivory Coast and Belgium. Summers, Haigh, Dr. Milton Segal, Bennett and Reed were officers and/or directors in IMT who held similar posts with ATL. At the 1987 stockholders' meeting, Summers, Haigh and Reed were elected directors, and Summers is listed as chief executive officer in ATL's 1987 Annual Report. The report states that ATL was organized in 1985 "for the purpose of developing the farm raised fish (originally catfish) technology and correlating consumer markets." At the 1988 ATL stockholders' meeting, Reed and Summers were once again elected as directors of ATL.

¶48. By February, 1986, Dr. Holly had incorporated Geo-Marine Resources, which operated as a seafood distributor and targeted restaurants and the military as potential customers. Hobbs and Chambliss were also associated with Geo-Marine Resources, with Hobbs utilizing his New York connections to attempt to secure business. Hobbs noted that IMT and Geo-Marine were completely different enterprises, given that IMT was engaged in the business of selling catfish farming technology, while Geo-Marine was a seafood broker engaged in the business of selling seafood.

¶49. Dr. Holly filed a shareholder derivative suit against Summers and others on September 17, 1986 based on their actions in connection with IMT. Following a hearing on March 1-3, 6, 7, 14 and 15, 1989, the chancellor entered a judgment against Jack Summers, John Haigh and ATL for $245,819.36, being $175,000 in damages, $65,000 in attorneys' fees and $5,819.36 in expenses.

¶50. Aqua-Culture Technologies, Ltd., Summers and Haigh have appealed and assign as error:

> 1. The trial court erred in denying the Defendants' Motion to Dismiss the Plaintiff's derivative claims due to her conflicts of interest.
>
> 2. The trial court erred in holding that the Plaintiff met the two-prong test of corporate opportunity announced in *Ellzey v. Fyr-Pruf, Inc.*, 376 So. 2d 1238 (Miss.1979).
>
> 3. There is insufficient evidence in the record to support any holding that IMT had the financial ability to perform the feasibility study in Zaire.
>
> 4. The trial court erred in holding that Jack Summers had any duty to arrange financing for IMT.
>
> 5. The trial court erred in holding that Jack Summers misused any corporate funds.
>
> 6. The trial court erred in awarding any damages because there were no lost profits.
>
> 7. The trial court erred in awarding attorney's fees in addition to damages.

¶51. Dr. Holly filed a cross-appeal and assigns as error the following:

> 1. The Chancellor erred in limiting the award to $245,819.36 in view of Dr. Holly's proof of $422,500 in damages suffered by IMT and its innocent shareholders.

2. The Chancellor erred in failing to award punitive damages in favor of IMT.

3. The Chancellor erred in failing to award prejudgment interest to IMT.

4. The Chancellor erred in holding that defendants, Dr. Milton Segal and Henry Reed, are not liable.

5. The Chancellor erred in failing to fashion a remedy which excludes the wrongdoers from participation in the recovery.

## LAW

¶52. Under the findings of the chancellor, Summers, aided and abetted by Haigh, grossly violated his fiduciary duties with regard to IMT. The chancellor also found that Summers had diverted corporate funds to his own use, misused IMT's money and time, and was engaged in forming a duplicate enterprise in the form of a new corporation, ATL, to divert all of the expertise, work product and good will of IMT into ATL. All the above findings of the chancellor are amply supported by the evidence, and it is from this perspective that we must examine the contentions of Summers and Haigh on appeal.

## I. ADEQUATE REPRESENTATIVE?

¶53. Appellants argue that the Chancellor erred in overruling their Motion to Dismiss, wherein it was asserted that Dr. Sandra Holly was an inadequate representative of IMT shareholders in the shareholder derivative suit. Appellants argue specifically that:

1. Dr. Holly brought the action with "unclean hands" because of her involvement with Geo-Marine Resources, Inc., an alleged competitor of IMT; she had a conflict of interest because of Geo-Marine; and

2. she had little support from IMT shareholders.

## 1. "Unclean Hands" and Conflict of Interest

¶54. Dr. Holly resigned from IMT in June, 1985, and in February, 1986 incorporated Geo-Marine Resources, Inc., which, as noted earlier, served as a seafood distributor to retailers and wholesalers. The appellants argue that Geo-Marine Resources took advantage of IMT's business opportunities, giving Holly "unclean hands" and creating a conflict of interest which precluded her from serving as a fair representative of IMT. This argument is unpersuasive, given that IMT was a defunct enterprise and as such not in a position to compete with any Geo-Marine, or any other business for that matter. Further, Geo-Marine would not have been a competitor of IMT even if IMT had been an active business. If anything, Geo-Marine was a prospective customer of IMT's, and the operations of the Geo-Marine were in no way in competition with those of IMT. This assignment of error is without merit.

## B. No Support from IMT Shareholders

¶55. The appellants presented eight affidavits from IMT shareholders stating that Dr. Holly did not represent their interests and hurt the value of their ATL stock. These eight shareholders were Sheila Sidelnick, Lawrence Segal, Lawrence Segal & Associates, Dr. Milton Segal, Charles Verpoorten, Mark Heinsen, Charles Metzendorff and Paul Merl, who were closely associated with Jack Summers. Dr. Holly points out that she has an equal number of affidavits supporting her as the representative in the derivative

suit.

¶56. Again, appellants' argument lacks merit. It is manifest that IMT acutely needed some interested shareholder to act on its behalf. Dr. Holly clearly performed that function, and in so doing rendered an invaluable service to the innocent shareholders. The chancellor committed no error in holding that Dr. Holly was a fair and adequate representative. See: *Bruno v. Southeastern Services, Inc*. 385 So. 2d 620, 622 (Miss. 1980); *Brandon v. Brandon Construction Co. Inc.*, 776 S.W.2d 349, 353 (Ark. 1989); *Larson v. Dumke*, 900 F.2d 1363, 1367 (9th Cir. 1990).

## II. CORPORATE OPPORTUNITY

¶57. The Chancellor found that Summers, Haigh and ATL usurped corporate opportunities from IMT, applying the test of *Ellzey v. Fyr-Pruf, Inc.*, 376 So. 2d 1328 (Miss. 1979). In *Fyr-Pruf,* this Court adopted a two part test for determining whether a party had made out a prima facie case of conflict of interest arising from a business opportunity in question being a corporate opportunity. *Fyr-Pruf,* 376 So.2d at 1333. This Court stated in *Fyr-Pruf* that:

> The first (question in the two-part test) asks whether the complainant has shown the business opportunity to be reasonably related to the existing or prospective business activities of the corporation. The second asks whether the plaintiff has shown the financial ability of the corporation to seize the opportunity. *Id.*

The Chancellor ruled that the opportunity in question had been a corporate one, based on the factors set out in *Fyr-Pruf*. The Chancellor also found that Summers, still an IMT director, had abandoned IMT and engaged in promoting and organizing ATL, and that said actions constituted a breach of his duties to IMT. The Chancellor further found that Summers failed to promote or attempt to secure financing for IMT.

¶58. The crux of the appellants' argument is that Dr. Holly failed to meet the second part of the *Fyr-Pruf* test by failing to prove that IMT had the financial ability to seize the corporate opportunity in question. This argument is singularly inapt. Summers and Haigh should not and will not be permitted to argue that IMT lacked the financial ability to take advantage of the opportunities when Summers and Haigh were material actors in causing its insolvency. As noted earlier, the Chancellor found that Summers in particular had neglected to perform his assigned duties of promoting the corporation and securing financing for IMT. There was also substantial evidence of a neglect of duties on the part of Haigh. As this Court made clear in *Fyr-Pruf*, Summers and Haigh may not cause IMT serious financial hardships through their breach of fiduciary duties and then use that same financial hardship to argue that, under *Fyr-Pruf*, a corporate opportunity did not exist. *Id.* at 1335. See also: *Durfee v. Durfee & Canning*, 80 N.E.2d 522, 530 (Mass. 1948); *Trayer v. Bristol Parking Inc*, 95 S.E.2d 224 (Va. 1956); *Knutsen v. Frushour*, 436 P.2d 521 (Idaho 1968); *Hill v. Hill*, 420 A.2d 1078 (Pa. 1980). Accordingly, this point of error is overruled.

## III. DAMAGES

¶59. Appellants assert error in the Chancellor's award of $175,000 in compensatory damages, claiming that ATL never had any profits which would support the Chancellor's ruling with regard to damages. In *Norte & Co. v. Huffines*, 288 F.Supp. 855 (S.D.N.Y. 1968), the district court dealt with a shareholder derivative suit in which there was a fraudulent exchange of stock by the directors, who misled stockholders

and deprived the corporation of an opportunity to purchase shares at a lower price while profiting individually off the deal. The Court stated:

> Although recovery of profits may be awarded where one who breaches a fiduciary obligation makes profits in excess of the loss cause by the breach, . . . one who breaches a fiduciary obligation is responsible for the entire loss suffered by the corporation as a result of the breach. This liability is not limited to the recovery of profits or to "out-of-pocket" loss. *Huffines*, 288 F.Supp. at 864.

¶60. This Court stated recently in *R & S Development, Inc. v. Wilson*, 534 So. 2d 1008, 1012 (Miss. 1988), as to the extent of damages:

> Liability cannot be escaped on the grounds that the proof as to the amount of damages, if any, is too uncertain to justify the lower court's award. It is well recognized that Mississippi is equally firm in its determination that a party will not be permitted to escape liability because of the lack of a perfect measure of damages his wrong has caused.

*See also Nichols v. Stacks*, 485 So. 2d 1034 (Miss.1986). The Chancellor did not err in his award of damages, and this point of error is overruled.

### IV. ATTORNEY FEES

¶61. Appellants insist that the $65,000 award of attorney fees should not be taxed to them because, under the "American rule" in derivative actions, attorney fees are not ordinarily recoverable from the losing party in a civil suit in the absence of a statute, an enforceable contract providing therefore, or an equitable discretion in the trial court. 19 Am.Jur.2d *Corporations* § 2485 (1986).

¶62. Additionally, appellants contend that if the attorney fees are awarded, they should be awarded under the "common-fund" exception to the American rule, in which case Dr. Holly would recover attorney fees from IMT. Under the common-fund doctrine, the plaintiffs in a shareholders' derivative action may recover attorney fees from the corporation on whose behalf the action is taken if the corporation derives a benefit from the plaintiffs' successful prosecution of the case. 19 Am.Jur.2d *Corporations* § 2487 (1986).

¶63. Finding no applicable Mississippi case law in the specific context of shareholders' derivative suits in cases in which the corporation has ceased to function, we turn to the general Mississippi law dealing with the awarding of attorney fees. This Court held in *Greenlee v. Mitchell*, 607 So.2d 97, 108 (Miss. 1992) that, in cases in which there is "no contractual provision or statutory authority for attorney fees, they may not be awarded as damages unless punitive damages are also proper." In the present case, the trial judge did not award punitive damages, but he nevertheless awarded attorney fees, which may appear at first blush to be an inconsistent result. This Court finds, however, that the conduct of the defendants in this case was of a nature such as to make the awarding of punitive damages appropriate, even though the trial judge chose not to do so.

¶64. Moreover, no litigant is entitled to punitive damages as of right. The question is always one for the finder of fact to determine based upon the circumstances of the case whether, in its view, the offender should be subjected to punishment in order to deter the offensive conduct. *Harvey-Latham Real Estate v. Underwriters at Lloyd's, London*, 574 So.2d 13, 17 (Miss. 1990). The fact finder is never under a duty to award punitive damages. *Allen v. Ritter*, 235 So.2d 253 (Miss. 1970). "The awarding of punitive damages, when allowable, is discretionary with the jury or with the judge trying cases without a jury." *Ellis*

*v. S. Pelligrini, Inc.*, 163 Miss. 385, 386; 141 So. 273, 274 (Miss. 1932).

¶65. Thus, the question of whether punitive damages should be awarded depends largely upon the particular circumstances of the case. A trial judge may validly find that, although the conduct of a defendant in a given case is such that the awarding of punitive damages would be appropriate, the actual awarding of additional monetary damages above the compensatory damages would serve no purpose or otherwise be inappropriate. Nevertheless, the trial judge may also validly find that the plaintiff should not have to suffer the expense of litigation forced upon it by the defendant's conduct, and therefore determine that attorney fees should be awarded. A trial judge should be granted the flexibility to find that, although the actual awarding of punitive damages is inappropriate, the conduct of the defendant is so extreme and outrageous that he, rather than the plaintiff, should bear the expense of litigation.

¶66. This Court's holding in *Greenlee* and other cases was that attorney fees may be awarded in cases in which the awarding of punitive damages is *proper.* This Court did not hold in *Greenlee* that the actual awarding of punitive damages was a prerequisite for the awarding of attorney fees, and we expressly hold here that such an actual awarding of punitive damages is not a prerequisite for the awarding of attorney fees. We expressly find that, under the facts of this case, the awarding of punitive damages would have been justified, even though, as will be seen, we do not find the chancellor to have abused his discretion in refusing to grant said damages. Accordingly, the ruling of the trial judge in awarding attorney fees is **affirmed**.

## V. DR. HOLLY'S CROSS-APPEAL

### A. Punitive Damages

¶67. Dr. Holly argues that the conduct of appellants was deceitful, oppressive and wrongful, justifying an award of punitive damages. *Holden v. Construction Machinery Co.*, 202 N.W.2d 348 (Iowa 1982). The chancellor, however, held that punitive damages should not be awarded in this case. In *South Central Bell v. Epps*, 509 So. 2d 886, 892 (Miss.1987), this Court held that "there is no right to an award of punitive damages and such damages are to be awarded only in extreme cases." This Court also noted in *South Central Bell*, which was tried before a jury in circuit court, that:

> Of course, the trial judge initially determines whether to submit the issue of punitive damages to the jury. He is required to review all of the evidence presented and determine whether the facts of the case and the conduct of the defendant was such that 'the jury should be called upon to decide the justification and amount of punitive damages . . . .' *Blue Cross*, 466 So. 2d at 842. However, such a decision cannot come from precise formula but rather must come from the trial judge's life experience. *Fedders Corp. v. Boatright*, 493 So. 2d at 311. Nevertheless, we will not hesitate to reverse the trial judge's decision where the facts of a particular case do not warrant instructing the jury as to the availability of punitive damages. *See Fedders Corp. v. Boatright*, 493 So. 2d 301 (Miss.1986), (trial judge's decision to instruct jury on punitive damages reversed). *South Central Bell*, 509 So.2d at 893.

¶68. In *Fought v. Morris*, 543 So. 2d 167, 173 (Miss.1989), a chancery case, we held that whether to award punitive damages was within the discretion of the chancellor, and "will not be disturbed by this Court" absent an abuse of said discretion. While some members of this Court may be of the opinion that this is a case in which punitive damages should not have been altogether denied, it was manifestly within the discretion of the chancellor to make such a decision, and we are unable to hold that he abused his

discretion in refusing to award punitive damages.

## VI. SHOULD SUMMERS AND HAIGH PARTICIPATE IN JUDGMENT PROCEEDS?

¶69. The records as to stock ownership were conflicting. The chancellor directed the parties to file a stipulation of ownership, and, as to the parties whose ownership interest was in dispute, a hearing date was set to make such determination. The chancellor entered final judgment for purposes of MRCP 54(b), but expressly retained jurisdiction to determine shareholder status.

¶70. Dr. Holly originally cross-appealed from any consideration of Summers or Haigh as possible shareholder beneficiaries of the judgment, arguing, particularly as to Summers, that, as the largest shareholder, he would be deriving the most benefit from the judgment, a manifestly inequitable result. However, on May 17, 1995, in an effort to expedite the appeals process following Summers' filing of a Chapter 7 petition in bankruptcy, Dr. Holly moved to voluntarily dismiss her cross-appeal against Summers. This motion was granted by this Court, even though we are of the opinion that said cross-appeal was well-taken. If an appellant should desire to dismiss an appeal filed with this Court, we will generally not bar said appellant from doing so, although we do have discretion to do so.

¶71. On November 8, 1995, Summers was granted a discharge in his bankruptcy case, which had the result of lifting the automatic stay and making this case ripe for decision by this court. While this Court is of the opinion that the cross-appeal pursued by Holly against Summers and Haigh was well-taken, the voluntary dismissal of the cross-appeal as it relates to Summers leaves this Court to consider this issue on cross-appeal solely as it relates to Haigh. This Court agrees with Holly that Haigh should be precluded from recovering on the judgment in this case based upon his status as a shareholder.

¶72. In *Perlman v. Feldman*, 219 F.2d 173 (2nd Cir. 1955), a derivative action was brought by minority stockholders of a steel company demanding an accounting for and restitution of profits accruing to a dominant stockholder, who was also chairman of the board and president of the corporation. In holding that the dominant stockholder had breached his fiduciary duty and should therefore be accountable to the minority stockholders, the Court held that the plaintiffs/ minority stockholders were "entitled to a recovery in their own right, instead of in right of the corporation (as in the usual derivative actions), since neither [the defendant who breached his fiduciary to minority stockholders] should share in any judgment which may be rendered." *Id*. at 178.

¶73. In *Abrams v. Occidental Petroleum Corporation*, 20 Fed.R.Serv. 2d 170, 178 (S.D.N.Y. 1975), the U.S. District Court held:

> There is substantial authority for awarding a personal rather than a corporate recovery in a [pure] derivative suit under exceptional circumstances. This may be done . . . where the wrongdoing defendant owns substantial amounts of stock so that a corporate recovery would result in the defendants reimbursing themselves to the extent of the stock interest. [citations omitted]

¶74. Haigh held a substantial number of IMT shares. If he were awarded a percentage of the damages award, the court would be reimbursing Haigh for his own wrongs and misconduct. The chancellor should have barred Haigh from recovering in the judgment as an IMT shareholder. We therefore reverse that part of the judgment which holds that Haigh is a possible beneficiary of any sums recovered by IMT. Upon remand, the chancellor, in making a determination as to the amount each shareholder shall be entitle to

receive from the judgment proceeds, shall exclude Haigh.

¶75. The remaining assignments of error on cross-appeal are without merit, and do not require discussion. Therefore, the judgment of the chancery court is affirmed on direct appeal, and is also affirmed on cross-appeal except insofar as Haigh was adjudged a possible shareholder beneficiary.

¶76. **DIRECT APPEAL: JUDGMENT IS AFFIRMED.**

**CROSS APPEAL: JUDGMENT IS AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**SULLIVAN, P.J., PITTMAN, BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. LEE, C.J., AND McRAE, J., CONCUR IN RESULT ONLY.**

1. Henry Reed, Jr., and Dr. Milton Segal were party defendants, but the Chancellor found no breach of fiduciary duty on their part and not liable for any damages. IMT was a nominal defendant.

2. No minutes appear as to this Board meeting. Hobbs thought it was late April or early May, 1985.