# IN THE COURT OF APPEALS 2/25/97

# OF THE

# STATE OF MISSISSIPPI

## NO. 93-CA-01455 COA

INTERNATIONAL PAPER COMPANY

APPELLANT

v.

LAMAT TIMBER AND FIBER COMPANY AND JAMES W. WARRINGTON

APPELLEE

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

TRIAL JUDGE: HON. W. O. DILLARD

COURT FROM WHICH APPEALED: HINDS COUNTY CHANCERY COURT

ATTORNEYS FOR APPELLANT:

PAUL NORMAN DAVIS

DONNA BROWN JACOBS

ATTORNEYS FOR APPELLEE:

PETER L. CORSON

JONATHAN B. FAIRBANK

WILLIAM C. WALKER JR.

NATURE OF THE CASE: CONTRACT

TRIAL COURT DISPOSITION: PLAINTIFF AWARDED $330,414.35 PUNITIVE DAMAGES

MANDATE ISSUED: 8/29/97

**EN BANC:**

KING, J., FOR THE COURT:

International Paper Company (IP) appeals a Hinds County Chancery Court judgment, which awarded Lamat $330,414.35 in punitive damages. IP contends that the punitive damage award should be reversed because:

I. Punitive damages are not recoverable absent a finding of actual damages. Contrary to

the trial court's opinion, IP did not confess liability by interpleading the funds.

II. Lamat's initial breach of warranties contained within the contract excused IP's performance

and precluded the award of punitive damages.

III. Lamat fraudulently induced IP into agreeing to the contract; therefore the "clean hands"

doctrine precludes Lamat's recovery of punitive damages.

IV. IP's conduct did not arise to the level of an independent tort which would justify an award of

punitive damages.

V. Lamat failed to prove that IP behaved with actual malice.

VI. A judgment cannot exceed the amount prayed for in the complaint. Lamat's counterclaim for punitive damages requested only $180,000.00; therefore if punitive damages are justified, the

award should be reduced to the $180,000.00 prayed for by Lamat.

We find merit in IP's appeal and therefore, reverse the trial court's award of punitive damages to Lamat.

**FACTS**

On or about February 5, 1991, the Appellee, James Warrington contracted with Deposit Guaranty National Bank (DGNB) to purchase timber and farm land belonging to the Joseph Edmond Johnston Revocable Trust, which the parties refer to as the Johnston tract. The agreement provided that the closing of the sale would occur on February 27, 1991, but the agreement also provided that the date of closing could be extended for a three (3) week period provided Warrington paid $1,000.00 in advance for each week the closing was extended. Pursuant to the terms of the agreement, Warrington had until March 20, 1991 to close the sale.

On or about February 18, 1991, International Paper (IP) contracted to purchase timber from Lamat. Warrington signed the agreement in his capacity as president of Lamat. Lamat agreed to deliver timber to IP's Vicksburg mill for a period of three months at the rate of $16.00 per ton.

Even though the contract between Warrington and DGNB did not authorize the severance of timber from the Johnston tract prior to closing, beginning on February 23, 1991 and until March 28, 1991, Warrington severed and delivered timber from the Johnston tract to IP's Vicksburg mill pursuant to the IP-Lamat contract.

IP paid Lamat for the timber deliveries until about mid-March. In mid-March, IP suspended payments to Lamat because Warrington owed International Paper Realty Corporation, a wholly owned subsidiary of IP, money on a promissory note and deed of trust, which covered a tract of land located in Madison Parish Louisiana and referred to as the Gurd tract.

In mid-March, DGNB discovered Warrington's unauthorized severance of the timber and contacted Warrington. Thereafter, on March 20, 1991, DGNB and Warrington modified the sales contract. The modified contract authorized Warrington to sever timber from the Johnston tract. However, Warrington was required to advise timber purchasers to remit payment for the timber to DGNB. Profits from the sale of the timber were to be applied toward the promissory note, which Warrington would execute at the closing of the sale.

In addition to modifying the sales contract on March 20, DGNB and Warrington proceeded to close the sale. Pursuant to the terms of the contract, Warrington tendered a check in the amount of $154,000, which represented the down payment. However, the check was dishonored due to insufficient funds. DGNB agreed to proceed with the sale if Warrington procured the funds by March 21, 1991. Warrington failed to procure the funds by the deadline, and the contract was rescinded.

After the contract had been rescinded, DGNB contacted I.P. and requested an accounting and payment for the timber delivered by Lamat. Lamat continued to claim entitlement to the funds being held by I.P., and I.P. advised Lamat that I.P. would continue to hold the funds until DGNB's claim to the funds had been resolved. Subsequently, in May 1991, Lamat forwarded correspondence to I.P. directing I.P. to remit all funds being held for the account of Lamat to DGNB. The correspondence also advised I.P. that Lamat would hold I.P. harmless for tendering the funds to DGNB. In response to Lamat's correspondence dated May 1991, I.P. instructed its counsel to prepare releases to be signed by DGNB, Warrington and Lamat. Because the parties were unable to agree upon the terms of the releases, I.P. petitioned the court to interplead the funds into its registry. In response, Lamat filed a counterclaim against I.P. for actual and punitive damages based upon bad faith breach of contract.

The court granted I.P.'s petition and the funds were deposited into the court's registry. Warrington, Lamat, I.P. and DGNB eventually reached a settlement regarding the fund's entitlement, and the court entered an agreed order instructing the clerk to release the funds to DGNB and Lamat. However, no settlement was reached regarding Lamat's claim for actual and punitive damages.

After trial of Lamat's claim for actual and punitive damages, the court determined that Lamat sustained actual damages as a result of I.P.'s failure to remit payment for the timber pursuant to the contract. In addition, the court determined that I.P. confessed damages by interpleading the funds.

With respect to Lamat's claim for punitive damages, the court made the following findings and determined that punitive damages were justified:

1. International Paper and International Paper Realty were separate corporate entities;

2. Warrington acted in his individual capacity with respect to the Gurd transaction, but as

a corporate officer with respect to the contract with International Paper;

3. International Paper Company suspended the payments because it wanted to be sure that

Lamat did not owe its subsidiary, International Paper Realty or because it wanted to improve

International Paper Realty's position regarding its dispute with Warrington over the Gurd transaction;

4. International Paper Company knew in fact or should have known, that James Warrington

was the party liable to International Paper Realty.


### ANALYSIS OF THE ISSUE AND DISCUSSION OF LAW

This appeal requires us to determine whether the chancellor abused his discretion by awarding punitive damages to the Appellees. *See Aqua-Culture Technologies, Ltd. v. Holly,* 677 So. 2d 171, 185 (Miss. 1996) (explaining that the decision to award punitive damages was within the discretion of the chancellor and would not be disturbed absent abuse of said discretion) (citation omitted).

The chancellor's award of punitive damages to the Appellee was premised upon finding that I.P. intentionally withheld payment of the contractual obligation for the purpose of coercing Warrington into settling obligations due another party under a separate contract. The law of our state permits parties to recover punitive damages in breach of contract cases when the breach is attended by intentional wrong, insult, abuse, or such gross negligence as amounts to an independent tort. *Polk v. Sexton,* 613 So. 2d 841, 845 (Miss. 1993) (citing *Fought v. Morris,* 543 So. 2d 167, 173 (Miss. 1989)).

Identifying which conduct warrants the imposition of punitive damages is not susceptible to formulaic calculation; therefore, the trial judge's life experience is relied upon as a measuring tool. *Holly,* 677 So. 2d at 185. Despite the absence of a precise formula for determining whether a party's conduct

justifies the award of punitive damages, the supreme court has held that the use of a party's dire financial straits or inferior bargaining position as settlement leverage justifies the awarding of punitive damages. *See Andrew Jackson Life Ins. Co. v. Williams,* 566 So. 2d 1172, 1190 (Miss. 1990); *Travelers Indem. Co. v. Wetherbee,* 368 So. 2d 829, 835 (Miss. 1979) (insurer's offer to pay contents coverage each time it offered to pay dwelling coverage upon low estimate of repairs created strong inference that insurer refused to pay contents coverage for economic gain). The intentional withholding of an obligation due for the purpose of coercing a party into settling an obligation owed another falls within the perimeter of conduct sanctioned in the previously cited decisions. Thus, punitive damages would be justified in the instant case.

However, one of the oldest maxims of the law is that no man shall, in a court of justice, take an advantage which has his own wrong as a foundation for that advantage. *Collins v. Collins,* 625 So. 2d 786, 789 (Miss. 1993) (quoting *Thigpen v. Kennedy,* 238 So. 2d 744, 746-47 (Miss. 1970)). Moreover, equity requires clean hands of those seeking to enter its domain. *Thigpen v. Kennedy,* 238 So. 2d 744, 746 (Miss. 1970). This maxim has also been phrased in the following language: "he who doeth fraud, may not borrow the hands of the chancellor to draw equity from a source his own hands hath polluted." *Thigpen*, 238 So. 2d at 746 (citing Griffith, *Miss. Chancery Practice*, § 42 (1950)). This maxim should not be lightly considered or brushed aside. *Id.* Indeed, the Court has a duty to apply sua sponte the maxim whenever it becomes apparent that the facts are such that application of the maxim is warranted. *Id.* A court should refuse to award remedy to a party whose conduct violates conscience, good faith, or other equitable principle. *Id.* In essence, the tenet underlying the preceding maxims is that equity will not serve to permit parties to profit from their wrongdoing.

Contrary to the chancellor's opinion in the instant case, Lamat's conduct toward DGNB has significant relation to Lamat's bad faith breach of contract claim. For approximately three weeks, Lamat severed and delivered to IP timber without the consent of DGNB. Not only did Lamat sever and deliver timber to IP without the consent of DGNB, Lamat retained proceeds received from the sale of the timber until IP suspended payment. This conduct by Lamat constituted conversion. *See Walker v. Brown,* 501 So. 2d 358, 361 (Miss. 1987) (explaining that conversion is the intent to exercise dominion or control over goods which is inconsistent with the true owner's right). Although DGNB subsequently authorized Lamat to sever and sell timber from the Johnston tract, we find this fact to be of little or no consequence because the tort was completed upon Lamat's severance and deliverance of the timber to I.P. *Walker,* 501 So. 2d at 361 (explaining that the tort is complete upon taking possession from the owner, and no demand for the chattel's return is necessary) (citation omitted). Notwithstanding the fact that the tort was completed upon Lamat's severance and deliverance of the timber to I.P., our finding of conversion is supported by the fact that Lamat retained proceeds received from the sale of the timber even though DGNB was designated to receive the net proceeds derived from the sale of the timber.

The chancellor's award of punitive damages allows Lamat to benefit from its wrongdoing. Equity should not serve to permit a wrongdoer to increase its profit margin. Therefore, we are obliged to apply the clean hands maxim and reverse the chancellor's punitive

damage award. Accordingly, we reverse and render the chancellor's award of punitive damages to Lamat.

**THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS REVERSED AND RENDERED. COSTS OF THIS APPEAL ARE TAXED EQUALLY TO THE PARTIES.**

**BRIDGES, C.J., THOMAS, P.J., BARBER, COLEMAN, DIAZ, PAYNE, AND SOUTHWICK, JJ., CONCUR.**

**McMILLIN, P.J., AND HERRING, J., NOT PARTICPATING.**